**In re Desiree CRUMMIE, Debtor.**

**In re Antonio and Myrna YSAGUIRRE, Debtors.**

**Bankruptcy Nos. 94–57951–ASW–OR, 95–51407–ASW–OR.**

United States Bankruptcy Court,
N.D. California.

March 20, 1996.

Marcia E. Gerston and Evelyn T. Crane (argued), Levy, Greenfield & Davidoff, San Jose, CA, for Creditor GMAC.

James M. Lauderdale (argued), Law Offices of James M. Lauderdale, Monterey, CA, for Debtor Desiree Crummie.

Clark A. Miller (argued), Law Offices of Clark A. Miller, Salinas, CA, for Debtors Antonio and Myrna Ysaguiree.

Leon Jon Bonney (argued), Office of Duncan A. Kester, San Jose, CA, for Chapter 13 Trustee.

## MEMORANDUM DECISION DENYING MOTION TO COMPEL ASSUMPTION OR REJECTION OF CONTRACT

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

### INTRODUCTION

General Motors Acceptance Corporation ("GMAC") has filed a motion in each of the above-entitled cases, seeking to compel the debtor in each case to assume or reject an executory contract between each debtor and GMAC. With the consent of all parties, the motions in the two cases have been handled together because the substantive provisions of the subject contracts are identical. The debtors (collectively, "Debtors") in both cases oppose GMAC's motions, as does Duncan H. Kester, the Chapter 13 Trustee ("Trustee").

GMAC is represented by Marcia E. Gerston, Esq. and Evelyn T. Crane, Esq. of Levy, Greenfield & Davidoff. Debtor Desiree Crummie ("Crummie") is represented by James M. Lauderdale, Esq. Debtors Antonio and Myrna Ysaguirre (collectively, "Ysaguirre") are represented by Clark A. Miller, Esq. Trustee is represented by Leon Jon Bonney, Esq.

All parties have filed briefs and oral argument has been concluded.

## I.

### BACKGROUND

Petitions under Chapter 13 of Title 11, United States Code, were filed by Crummie on December 19, 1994, and by Ysaguirre on March 8, 1995.[1]

Prior to commencement of their respective Chapter 13 cases, Debtors entered into contracts with Love Chevrolet of Seaside, California ("Love"), entitled "SmartBuy ™ Retail Installment Sale Contract" ("Contract"); GMAC claims to be the successor in interest to Love. Aside from differing factual details of what automobile is being sold to whom at what price, the Contracts of Debtors have identical terms: the buyer is to pay the purchase price plus interest in forty-seven monthly installments plus a single "balloon" payment at the end of that time, and GMAC retains a security interest in the automobile until the purchase price has been paid in full.[2]

Debtors filed Chapter 13 plans treating GMAC as a creditor holding secured claims in the amount of the fair market values of the automobiles and unsecured claims for any deficiency balances, proposing to pay the secured claims at 100% plus interest and the unsecured claims at 10%.[3] GMAC objected to confirmation of both plans, asserting that the Contract was an executory one, subject to assumption pursuant to 11 U.S.C. § 365. By agreement in both cases, Debtors' plans were confirmed without prejudice to GMAC's right to move to compel Debtors to assume or reject the Contract.

## II.

### DISCUSSION

#### A. Executory Contracts

GMAC contends that the Contract constitutes an "executory contract" within the

---

1. These cases, having been filed after the effective date of amendments made October 22, 1994, are governed by Title 11, United States Code ("Bankruptcy Code"), as amended; unless otherwise noted, all statutory references are to the amended statute.

2. The Contract with Crummie provides for the buyer to purchase from Love a new 1994 Chevrolet automobile for the total sum of $10,533.10 ($8,442.11 principal plus $2,090.99 interest at the rate of 9.40%), payable in forty-seven monthly installments of $174.50 each from October 18, 1993 through August 18, 1997, plus a single payment at the end of that time on September 18, 1997, in the sum of $2,321.60. The Contract with Ysaguirre provides for the buyers to purchase from Love a new 1994 Chevrolet automo-

bile for the total sum of $23,927.95 ($19,163.81 principal plus $4,764.14 interest at the rate of 9.40%), payable in forty-seven monthly installments of $394.33 each from February 25, 1994 through December 25, 1997, plus a single payment at the end of that time on January 25, 1998, in the sum of $5,394.44.

3. Crummie's plan values the collateral at $5,900.00 (to be paid in full with interest at 10%) and GMAC filed a proof of claim for a total debt of $7,136.97, indicating an unsecured claim of $1,236.97 (to be paid at 10%). Ysaguirre's plan values the collateral at $12,200.00 (to be paid in full with interest at 11%) and GMAC filed a proof of claim for a total debt of $16,673.20, indicating an unsecured claim of $4,473.20 (to be paid at 10%).

meaning of § 365, which section authorizes assumption of executory contracts and unexpired leases,[4] and which also provides, at § 365(d)(2), that the Court may compel assumption or rejection by a date certain.

The term "executory contract" is not defined by the Bankruptcy Code, but its definition is well-settled under applicable case law:

> To determine whether a contract is executory for the purposes of the Code, we employ the following definition:
>
> > [An executory contract is] one on which performance is due to some extent on both sides.... [I]n executory contracts the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other. *Marcus & Millichap Inc. v. Munple, Ltd. (In re Munple)*, 868 F.2d 1129, 1130 (9th Cir.1989); *accord Griffel v. Murphy (In re Wegner)*, 839 F.2d 533, 536 (9th Cir. 1988); *Pacific Express Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express)*, 780 F.2d 1482, 1487 (9th Cir. 1986) (employing the definition of an executory contract formulated by Professor Countryman in *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L.Rev. 439, 460 (1973); *Fenix Cattle Co. v. Silver (In re Select–A–Seat)*, 625 F.2d 290, 292 (9th Cir.1980).

*In re Texscan Corp.*, 976 F.2d 1269, 1271–72 (9th Cir.1992).

### B. The Subject Contract

The Contract is a straightforward agreement for sale of an automobile on installment payment terms with a security interest retained by the seller, but for one feature: the balloon payment that falls due in the forty-eighth month as the final installment need not be made in full in cash on its due date, but can instead be made in one of three ways at the option of the buyer. The buyer can elect to make the balloon payment in full in cash when it comes due; or, the buyer can elect to sell the automobile to GMAC for an amount to be determined according to procedures set forth in the Contract, have that amount credited against the balloon payment, and pay the difference in cash; or, the buyer can elect to finance the amount of the balloon payment with GMAC on terms to be established if and when the buyer elects to finance. It is the existence of these options that GMAC contends renders the entire contract an executory one because, under two of the three options, GMAC would have to perform in response to the buyer's election.[5]

### (1) Cash

The option for the buyer to make the balloon payment by tendering cash does not, by its own terms, call for any counter-performance by GMAC. A contract under which a seller's sole remaining role is to accept payment does not constitute an executory contract, *In re Pacific Express*, 780 F.2d 1482 (9th Cir.1986) ("*Pacific Express*").

### (2) Sale

The option for the buyer to sell the automobile to GMAC does, on the face of it, call for some counter-performance by GMAC, in that it appears as if GMAC must purchase the automobile. However, a close analysis of this option reveals that all it actually provides is that GMAC might have to accept the automobile (valued at less than fair market value, regardless of its actual value) as part of the balloon payment.

In order to exercise this option, the buyer must give notice of intent to exercise thirty days prior to the due date of the balloon payment and then prove that: The automobile has not been encumbered; a certain

---

4. GMAC does not characterize the Contract as a lease, and the Court notes that the Contract does not comply with certain requirements of California law governing automobile leases: Civil Code § 2985.8, § 2986.2.

5. The term "option" is not used in this Memorandum Decision in the legal sense of an "option contract" or the like, but in the commonly understood sense of "choice". GMAC correctly points out that *In re Easebe Enterprises, Inc.*, 900 F.2d 1417, 1419 (9th Cir.1990) ("*Easebe*"), holds that "[a]n option contract is an executory contract", at least until some performance has commenced, but it does not follow that an enforceable "option contract" is created merely by provision of a choice.

234

maintenance schedule of service has been followed; the terms of any recalls requiring any repairs to be made have been observed; the automobile has not been altered in any way without GMAC's prior consent. Presumably, if a buyer does not meet all of these requirements, the sale option cannot be exercised. It should be noted in this regard that, after a four year period of ownership, a buyer (particularly one who had to file bankruptcy) may well be unable to demonstrate that all of these conditions have been met: The required service might not have been maintained throughout the period, or the buyer might not have retained records sufficient to demonstrate that the service was maintained; a buyer might have been ignorant of a recall; alterations might have been made in the normal course of using the vehicle; etc.

If a buyer does qualify to exercise the sale option, the automobile and title documents must be delivered to GMAC and sale will be effected. GMAC is then to credit the sale price against the balloon payment, with the buyer paying any difference. The sale price is to be the amount of the balloon payment less a $250 fee, less any "excess wear and tear deductions" and any "excess mileage deductions". The excess wear and tear deduction is the amount that GMAC in good faith reasonably estimates it would cost to make all repairs to the automobile that do not result from normal wear and tear, including but not limited to a list of ten specified defects (such as body repair, painting, upholstery tears and stains, tires with less than 1/8 inch of tread, unmatched tires, etc.) and "any other costs required to restore the vehicle to saleable condition". The contract provides that the sale price starts at the amount of the balloon payment and goes down by a minimum of the $250 fee, plus any deductions for excess wear and tear and/or excess mileage; the sale price is not dependent upon the market for used cars, and it can never equal or exceed the balloon payment (so that, since the buyer must pay the difference between the sale price and the balloon payment, the buyer will always have to pay at least the $250 fee).

If a buyer disagrees with the excess wear and tear deduction, the buyer can obtain (at the buyer's expense) a professional appraisal of the automobile by an independent third party acceptable to both the buyer and GMAC, and the sale price will then be the lesser of: 1) the balloon payment minus a $250 fee; or 2) the appraised value minus a $250 fee. Under this alternative scenario, if the appraised value were less than the balloon payment, the buyer would sell for the appraised value minus the fee, and would have to make up the difference between that sale price and the balloon payment; if the appraised value were more than the balloon payment, the sale price would be set at the lesser of the two (the amount of the balloon payment minus the fee), so that the difference between the sale price and the balloon payment would be the amount of the fee, and the buyer would have to make up that difference. While this method does take into account the actual value of the automobile, it does not allow for the buyer to reap any value that may exist over and above the amount of the balloon payment. The most favorable possible result for a buyer exercising the sale option would be to sell for the full amount of the balloon payment minus the fee, and have to make up only the amount of the fee.

This is not a "sale" transaction that obligates GMAC to perform by "buying" the automobile—all that GMAC has to do under this option (assuming that a buyer qualifies to exercise it) is accept tender of the balloon payment in the combined forms of an automobile and cash, plus an extra $250 fee. The amount of the cash portion of the payment is determined entirely by GMAC unless the other party demands an appraisal (and GMAC does not even have to pay for all or a portion of the appraisal), and the effect of an independent appraisal is then diluted by GMAC having already fixed the "sale price" as the *lesser* of the appraised value or the amount of the balloon payment (reduced by the fee in both cases). This option does not differ substantively from the option to make the balloon payment in cash, and it is no more mutually executory than is the cash payment option.

### (3) Finance

■ The option for the buyer to finance the balloon payment with GMAC also, on the face of it, calls for some counterperformance by GMAC, in that it provides for GMAC to enter into another financing agreement with the buyer.[6] This option states:

> You may enter into a new written agreement to refinance the payment due at the end of the Contract term. The monthly payments under the new agreement will be no greater than the average of your regular monthly payments under the Contract (exclusive of the payment due at the end of the Contract term). The Annual Percentage Rate for the new agreement may be different from the rate in effect under this Contract at the time of refinancing.

This option appears to be nothing more than an agreement to agree in the future on the terms of a financing transaction and, as such, may be unenforceable. *See, e.g.:* 14 Cal.Jur.3d (1974), *Contracts* § 57–§ 61; Witkin, 1 *Summary of California Law* (9th ed., 1987), § 155–§ 156; *Ellis v. Klaff,* 96 Cal. App.2d 471, 216 P.2d 15 (1950); *Ablett v. Clauson,* 43 Cal.2d 280, 272 P.2d 753 (1954); *Los Angeles v. Superior Court (Los Angeles Dodgers),* 51 Cal.2d 423, 333 P.2d 745 (1959); *Etco Corp. v. Hauer,* 161 Cal.App.3d 1154, 208 Cal.Rptr. 118 (1984); *Okun v. Morton,* 203 Cal.App.3d 805, 250 Cal.Rptr. 220 (1988); *Ladas v. Calif. State Auto Ass'n.,* 19 Cal. App.4th 761, 23 Cal.Rptr.2d 810 (1993).

The new financing agreement provided for by this option will, presumably, call for payment of a principal sum at a specified rate of interest in monthly installments over a period of time. Of those four elements—principal, interest rate, installment amount, term—only one is specified: the principal amount to be paid is the amount of the balloon payment. The interest rate is not stated, nor is the term of the new loan. The amount of the monthly installments is to be "no greater than the average of your regular monthly payments under the Contract" (exclusive of the balloon payment), which means only that a ceiling is placed upon the amount of the future monthly installments: No more than the current $174.50 for Crummie and no more than the current $394.33 for Ysaguirre, but it could be any amount from $1 up to those maximums, a wide range of possible payment amounts.

■ It is true that, as a general proposition, California law provides that Courts may insert "reasonable" terms and conditions into contracts that fail to specify all of the terms and conditions necessary to enforcement. For example, California Commercial Code § 2311(1) provides:

> An agreement for sale which is otherwise sufficiently definite ... to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

However, it is not clear that the finance option in the Contract is "otherwise sufficiently definite" to constitute an enforceable contract. Its only definite features are the principal amount of the debt and a maximum possible amount for the monthly installment—this leaves it to the parties to establish "in good faith and within limits set by commercial reasonableness" the term for repayment, the interest rate, and the actual amount of the monthly installment (all of which necessarily affect each other). If, despite mutual good faith, the parties are unable to agree on all of these elements, then it would fall to a Court to determine each of them with due regard to the "limits set by commercial reasonableness". It remains to be seen whether courts would be willing to infer "commercially reasonable" terms given the paucity of guidance in the Contract. Indeed, it is unlikely that reference to "commercial reasonableness" would even be possi-

---

6. An exception to the general authorization for assumption of executory contracts is found in § 365(c)(2), concerning executory contracts that are "a contract to make a loan or extend other debt financing or financial accommodations, to or for the benefit of the debtor". This restriction does not, however, amount to a prohibition against assumption of such contracts where the lender, for whose benefit the restriction was enacted, waives its protection, *"Easebe"*. GMAC states in its brief that it waives the protections afforded by § 365(c)(2); therefore, under Easebe, that section does not preclude the relief sought by GMAC.

ble in many situations that are created by the Contract: Four years ago, a buyer qualified under whatever GMAC's standards then were to finance the purchase of a new automobile on a secured basis with a fixed interest rate over a four year term with monthly payments of $395; four years later, that person asserts a contractual right to have GMAC finance a $5,000 balloon payment with monthly payments of no more than $395, with security consisting of a four-year old used car; the parties must then negotiate in good faith to establish how long the borrower may take to repay, what interest rate will be charged, and how much the monthly payments will be. The borrower might now be unemployed, or be earning much less and/or have much higher expenses than was the case four years ago, or be a bankruptcy debtor. Under GMAC's own lending standards or guidelines, the borrower might not now qualify for a loan of $5,000 on any terms whatsoever, but GMAC is contractually bound to make such a loan and negotiate every term of it in good faith. Even with all the good faith in the world, GMAC might have no frame of reference within which to do this for a borrower who was unqualified under GMAC's own lending standards; the Court assumes that GMAC's standards are not atypical but, even if that were not the case, it seems unlikely that standards of "commercial reasonableness" in the marketplace as a whole would encompass a borrower without income. What would notions of "commercial reasonableness" dictate as an interest rate for a borrower who had no income, or income that would permit of only $10 monthly payments? Does a marketplace for such transactions even exist? [7]

The finance option is so indefinite that its enforceability against GMAC is open to serious question. If this option cannot be enforced, it imposes no duty upon GMAC, let alone a material one.

This Court is not prepared to rule that, as a matter of law, the financing option in the Contract will always be unenforceable. That issue is not squarely before the Court.

Moreover, the enforceability of the provision may well depend upon the particular facts presented, including a debtor's own ability to pay. It is important to emphasize that the enforceability of this provision will likely be much more problematic if, after the initial term of the contract, the buyer is in bankruptcy, than would be the case in other contexts. Even between GMAC and a typical non-bankrupt customer, the parties will not enjoy equal bargaining power at any stage of the transaction, from the inception of the Contract through any refinance of balloon payment that may be called for at the end of the four year term; it is extremely unlikely that true negotiation actually occurs in such settings. When the customer is a bankruptcy debtor, the possibility seems even more remote that actual negotiation is going to take place, or that the debtor will have the sophistication or wherewithal to demand that GMAC refinance on terms that are reasonable for that buyer. Given the facts of life for bankruptcy debtors in general, it appears far more likely that the Contract will prove to be unenforceable in many, perhaps all, situations involving bankruptcy debtors, due to GMAC's refusal to refinance on terms acceptable to the debtors and/or due to the impossibility of fixing commercially reasonable terms to insert.

### C. Secured Installment Sales Contract

To date, four cases have been reported in which Bankruptcy Courts have considered whether the SmartBuy contract constitutes an executory contract subject to § 365, and all of them have rejected GMAC's position: *In re Cox,* 179 B.R. 495 (Bkrtcy.N.D.Tex. 1995) ("*Cox*"); *In re Keblish,* 180 B.R. 176 (Bkrtcy.E.D.Tex.1995); *In re Steffen,* 181 B.R. 981 (Bkrtcy.W.D.Wash.1995) ("*Steffen*"); *In re Lewis,* 185 B.R. 66 (Bkrtcy. N.D.Ca.1995). None of these cases has accepted GMAC's argument that, because the buyer has a right to make the balloon payment in a manner that might require some action by GMAC, the contract as a whole

---

7. While the Contract purports to bind GMAC to finance the vehicle after the initial term of the Contract, it remains to be seen whether courts will require GMAC to do so in situations where

the buyer has little or no income, or otherwise would not qualify for a commercially reasonable loan. This Court expresses no opinion herein on that issue.

constitutes an executory one for purposes of § 365. The consensus, with which this Court concurs, is that:

> In reality, the SmartBuy contract is simply an undefined financing arrangement. The 'options' are simply alternative methods by which the Debtor can repay the amount owed under the Contract.... The fact that the Contract provides the Debtor with three ways to pay does not make the Contract executory. *See Texstone Venture, Ltd.,* [54 B.R. 54 (Bkrtcy.S.D.Tex.1985)] (finding that an option for the lender to receive an equity participation in lieu of a monetary payment was an alternative to principal repayment that did not make the loan executory).

*Cox,* at 498.

This Court agrees with the reported decisions that the gravamen of the Contract is the sale of an automobile and, once the seller has delivered the automobile to the buyer, the seller has substantially performed. This Court also agrees with the reported decisions that the Contract operates as a security agreement and creates a security interest, which type of agreement is generally considered not subject to § 365, *Pacific Express* (*but see, Steffen*).

### D. Practical and Policy Considerations

Strong practical and policy reasons support the result reached by this Court and the other Bankruptcy Courts that have issued reported decisions concerning the SmartBuy contract, when all relative burdens are weighed.

If the Contract were considered an executory contract, a debtor could be compelled to assume or reject it by a date certain, pursuant to § 365(d)(2) [8]. If a debtor elected to reject, the rejection would constitute a breach pursuant to § 365(g) so that the vehicle would have to be returned, and the breach would create a claim treated as having arisen pre-bankruptcy, pursuant to § 365(g)(1). Since people generally need automobiles and the lack of one could negatively affect a debtor's ability to reorganize and/or to gain a fresh start, many or most debtors would have to assume the contract in order to avoid breach by rejection and retain the vehicle. Assumption would require the debtor to cure all defaults or provide "adequate assurance" of "prompt[ ] cure" pursuant to § 365(b)(1)(A), and also provide "adequate assurance" of future performance pursuant to § 365(b)(1)(B), either of which many bankruptcy debtors would simply not be in a position to do. If the debtor were able to assume the contract, performance would then be required under the terms of the contract without modification, meaning that the monthly payments would have to be made as and when due according to the contract, at the contract rate of interest, until the end of the contract term. If the debtor were not able to perform under the assumed contract and breached, such breach would give rise to a claim for damages caused by breach.[9] If the breach occurred prior to the case being converted to another chapter, the claim flowing from breach would arise at the time of rejection pursuant to § 365(g)(2)(A); as a post-bankruptcy claim, such a claim would constitute an administrative expense under § 503, taking priority under § 507 over the claims of pre-bankruptcy creditors and on a par with other administrative expenses of the estate, such as the claims of bankruptcy trustees and professionals appointed by the court. If the breach occurred after the case

---

8. The provision in § 362(d)(2) of the right to seek an order compelling assumption or rejection within a specific period of time is a codification of case law that developed under the former Bankruptcy Act; courts are to determine a "reasonable" time for the decision, depending upon the facts and circumstances of each case. *See generally,* 2 *Collier on Bankruptcy* (15th ed. 1995) ¶ 365.03[2].

9. It is not clear whether a Chapter 7 debtor who assumed an executory contract that included a lien upon collateral would thereby be foreclosed from later redeeming the collateral pursuant to § 722; nor is it clear whether such a redemption would constitute a breach of an assumed executory contract. The effect of redemption (which requires payment of the fair market value of the collateral in full upon redemption) is so inconsistent with performance under an assumed contract (which calls for payment according to contract terms over a prolonged period of time with interest) that the two remedies might be considered to be mutually exclusive.

had been converted to another chapter, the claim flowing from breach would arise immediately prior to conversion (if assumption occurred pre-conversion) pursuant to § 365(g)(2)(B)(i), or upon rejection (if assumption occurred post-conversion) pursuant to § 365(g)(2)(B)(ii); in either event, the claim would be a post-bankruptcy one entitled to administrative expense status in either the pre-conversion chapter or the post-conversion chapter, senior in priority to prebankruptcy claims and on a par with other administrative expenses. Assumption of executory contracts imposes burdens upon debtors to cure defaults promptly, assure future performance, and adhere to all contract terms without adjustment—if a debtor fails in this endeavor after assuming a contract, the resultant breach creates a claim against the estate that enjoys one of the highest priority categories, senior to *all* prebankruptcy claims, even those for wages and taxes, and shares equally with the claims of estate administrators. This is the treatment that GMAC seeks for itself under the Contract.

■ The impact on debtors, other creditors, and the bankruptcy estate is far less onerous if the Contract is viewed instead as a secured installment sales contract. Pursuant to § 506(a), the holder of a security interest has a secured claim with a value equal to the value of the collateral and an unsecured claim for any balance of the debt that may exist after credit is taken for the value of the collateral. Under Chapter 7, unless the collateral is abandoned by the trustee, a secured claim is paid in full and any unsecured portion is paid pro-rata with all pre-bankruptcy non-priority unsecured claims, to the extent of available funds (which usually permits of no payment). Under a Chapter 13 or Chapter 11 plan, a secured claim is paid in full and an unsecured claim is paid at least as much as the creditor would receive under Chapter 7 (in the two cases before the Court, the unsecured portion is being paid at 10%); the secured creditor thus recovers the full

value of its collateral but may recover less than 100% of any deficiency balance. Under § 1322, § 1325, and § 1326, pre-bankruptcy unsecured non-priority creditors receive nothing until secured claims are paid in full but, once that has been accomplished, such claims share equally with the unsecured portions of secured creditors' claims; administrative expenses are paid ahead of or simultaneously with secured claims, as are pre-bankruptcy priority claims such as those for wages and taxes. Unlike the situation where an executory contract is assumed, a secured claim is fixed at the value of the collateral and does not expose other creditors and the estate to the risk of post-assumption breach and the resulting creation of an administrative claim with priority senior or equal to that of existing claims. Such treatment is not unfair to secured creditors such as GMAC, since they receive the full present value of their collateral [10] (and, under Chapter 13, typically also receive at least a portion of their unsecured deficiency claim)—outside of bankruptcy, if a secured creditor were not paid and repossessed its collateral, it would recover only the value of the collateral plus a judgment for any deficiency balance, which judgment would then be subject to discharge in bankruptcy.

As the Bankruptcy Court noted in *Cox:*

In this case, GMAC seeks to expand its rights by urging the Court to classify what is intended to be a secured transaction as an executory contract. The Debtor desires to keep the automobile and pay GMAC less than she owes on the Contract. The Debtor might accomplish this pursuant to 11 U.S.C. § 1322(b)(2). If the Court were to find that the Contract is executory, the Debtor would have to pay GMAC the full amount due under the Contract in order to keep the Vehicle under 11 U.S.C. § 365. This motivation underlies GMAC's desire to have the Court classify the Contract as executory.

*Cox*, at 500, n. 5. Such a result is not warranted by the significant negative impact

---

**10.** The monthly payments to a secured creditor under a Chapter 13 or Chapter 11 plan need not be in the same amount as is specified by the contract, but must be such as to provide "present value" pursuant to § 1325(a)(5) and § 1129(b)(2)(A), which typically means payments

that are at least equivalent to the rate of the collateral's depreciation, *see United Savings Association of Texas vs. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

that it could have upon debtors, other creditors, and bankruptcy estates *versus* the comparatively minor negative impact that the contrary outcome could have upon GMAC (which drafted the Contract that is being interpreted). A judicial decision treating the Contract as an executory one subject to assumption under § 365 would encourage the sellers or financiers of vehicles or other personal property to insert into their contracts a provision such as the refinance option in GMAC's Contract, purporting to offer their buyers/borrowers a meaningful choice, in an attempt to divest bankruptcy debtors of the rights granted by Congress while giving them nothing of any actual value in exchange. Such an outcome would dramatically affect the rights and responsibilities of both debtors and creditors without Congressional action.

## CONCLUSION

For the foregoing reasons, the motion to compel assumption or rejection filed by General Motors Acceptance Corporation is denied. Counsel for the respective Debtors shall submit a form of Order so providing in their respective cases, after presenting them to counsel for GMAC and counsel for the Trustee for review as to form.