In re Jeffrey OWEN d/b/a C & J Express Co., Debtor.

In re Christine COLONELLO d/b/a C & J Express Co., Debtor.

Bankruptcy Nos. 97–65765, 97–65766.

United States Bankruptcy Court, N.D. New York.

April 13, 1998.

57

Fix, Spindelman, Brovits, Turk Himelein & Shukoff, P.C., Rochester, NY, Michael R. Mendola, of counsel, for Associates Commercial Corp.

Thomas, Collison & Meagher, Endicott, NY, Robert F. Whalen, of counsel, for Debtors.

Mark W. Swimelar, Syracuse, NY, Chapter 13 Trustee.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Presently before the Court are two identical motions filed on November 14, 1997, on behalf of Associates Leasing, Inc. ("ALI")[1] seeking orders from the Court fixing the time in which Jeffrey Owen and Christine Colonello, d/b/a C & J Express Co. ("C & J" or the "Debtors")[2] must make a determina-

1. Although the Notice of Motion indicates that the movant is Associates Commercial Corporation, the papers submitted in support of the motion refer to ALI.

2. The two individual debtors each filed a voluntary petition pursuant to chapter 13 of the Code. On February 13, 1998, the Court signed an Order

tion whether to assume or reject the contract or lease for two Great Dane trailers pursuant to § 365(d)(2) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). Opposition to the motion was filed by both Debtors on December 3, 1997.

The matter was originally argued on December 8, 1997, at the Court's regular motion term in Binghamton, New York. The matter was adjourned to the date of the confirmation hearing on January 12, 1998, at which time the Court reserved its decision.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the subject matter and the parties of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(A) and (O).

### FACTS

On or about December 5, 1996, the Debtors entered into a "Truck Lease Agreement" ("Agreement") with ALI, an Indiana corporation with a place of business in Buffalo, New York. *See* Exhibit "A" of ALI's Motion. According to the Agreement, ALI, as lessor, leased two refrigerated trailers to the Debtors: A 1996 Great Dane trailer was purchased by ALI on or about December 5, 1996, from Lancaster Equipment Corporation, Lancaster, New York, for a total price of $44,360. *See* Exhibit "D" attached to Affidavit of Robert F. Whalen, Esq. filed in Opposition to ALI's Motion ("Whalen Affidavit"). On or about December 18, 1996, ALI also purchased a 1997 Great Dane trailer for a total purchase price of $47,385. *See* Exhibit "G" attached to Whalen Affidavit. Both purchase orders identify C & J as the "lessee."

The salient provisions of the Agreement for purposes of this discussion are as follows:

1. The Agreement is labeled a "Truck Lease Agreement (TRAC [3]/Non–Maintenance)."

2. The Agreement identifies ALI as the "lessor" and C & J as the "lessee."

3. Section One expressly provides that the trailers are to remain the property of ALI even though under the control of the Debtors. It also states that the Debtors acquired no right, title, option or interest in either of the trailers and that they agree that they shall not assert any claim in or to an interest in either trailer other than that of a lessee.

4. Pursuant to Section Two, the Debtors agree to pay monthly rental for each trailer. The monthly rentals are subject to final depreciation adjustment. The Debtors are also required to pay one month's rent on each trailer as an advance payment pursuant to Schedule "A".

5. Section Three provides that the term of the lease is for 60 months, as set forth in Schedule "A" attached to the Agreement. The Debtors are entitled to terminate the lease on any anniversary of Delivery Date, as defined in Section Three, but the Debtors also are required to pay ALI any amount owing pursuant to Section Nine.

6. Section Seven requires the Debtors to pay fees, taxes, governmental assessments and charges levied, assessed or incurred during the term of the lease.

7. Section Eight requires that the Debtors return the trailers to ALI at the expiration or termination of the lease. It also provides that after said return, ALI "shall cause the trailers to be sold at public or private sale . . . ."

8. According to Section Nine, a final adjustment is to be made for each trailer upon receipt of the "net sales proceeds," as defined in Section 8. It further provides that

> Lessor shall pay to Lessee the amount, if any by which the sum of (a) net sale proceeds, and (b) surplus insurance recoveries, if any, on such Vehicle, exceeds (c) a Final Adjustment Amount, as defined herein, for such Vehicle calculated as of the rental payment date next preceding

---

granting the Debtors' motions for joint administration of the two cases.

**3.** "TRAC" is an acronym for "Terminal Rental Adjustment Clause." Such a clause provides

that at the end of the lease, the final payment due under the lease will be adjusted based upon he condition of the vehicle.

the date such Vehicle was returned to Lessor (referred to hereafter as the "Calculation Date"). the Final Adjustment Amount for any Vehicle as of a Calculation Date shall be computed by multiplying the Schedule "A" Value for such Vehicle by that percentage ("Final Adjustment Percentage") opposite the respective Calculation Date as set forth in the Final Adjustment Table attached hereto as Schedule B. If the sum of items (a) and (b) is less than item (c), Lessee shall, within ten days after notice thereof, pay the deficiency to Lessor as Adjusted Rental without abatement, offset or counterclaim arising out of any circumstance whatsoever. Lessor shall promptly determine the aforesaid amounts and shall render statements therefor to Lessee.

9. Section Ten places all risks for loss of or damage to either trailer on the Debtors.

10. Section Eleven requires the Debtors to purchase and maintain liability and physical damage insurance naming ALI an additional insured. It also requires that the amounts and insurers be approved by ALI. Section Eleven also provides that the Debtors agree to indemnify and hold ALI harmless from any and all liabilities defined therein.

11. Pursuant to Section Twelve, the Debtors assume responsibility for all expenses for operation and maintenance of the trailers.

12. According to Section Thirteen, ALI made no representation or warranty, expressed or implied, as to the value, condition, quality, etc. of the trailers.

13. Section Fourteen sets forth the events of default and ALI's remedies in the event of default. It provides that at the option of ALI, all rights of the Debtors in and to the trailers shall terminate. It further provides that

[u]pon such termination Lessee agrees that Lessor may, without notice to Lessee, either take possession of any or all Vehicles (with or without legal process) or require Lessee to return all Vehicles forthwith to Lessor .... Lessor may at its option (i) sell any or all of the Vehicles which are returned or repossessed pursuant to this Section and hold Lessee liable for Adjusted Rental as provided in Section 9, or (ii) lease any or all of the Vehicles to a person other than Lessee for such term and such rental as Lessor may elect in its sole discretion, and apply the proceeds of such lease, after first deducting all costs and expenses relating to the termination of this Lease and the retaking of the Vehicles, to Lessee's obligations hereunder ...

14. Section Fifteen prohibits the Debtors from assigning or subleasing any of their rights in and to the trailers without ALI's consent. On the other hand, ALI is entitled to assign the lease or an interest in the trailers without consent or notice to the Debtors.

15. Section Eighteen includes the statement that "[i]t is the intention of the parties hereto that this contract constitutes a lease for tax and other purposes; however, if for purposes of perfection, this contract is interpreted by any court as a lease intended as security, Lessee hereby grants to Lessor a security interest in the vehicles." [4]

On September 24, 1997, the Debtors each filed a voluntary petition pursuant to chapter 13 of the Code ("Petitions"). According to the Debtors' Statements of Affairs, C & J is a trucking business which began operation sometime in 1993.

It is the Debtors' position that the Agreement is not a lease but instead is an installment sales contract which the Debtors need not accept or reject. Instead, the Debtors assert that they have a right to purchase the trailers at the end of the 60 month term set forth in the Agreement. ALI takes issue with the Debtors' position, pointing out that the Agreement does not grant the Debtors the option to purchase the trailers. ALI contends that at the end of the "lease," the Debtors are required to make a balloon payment, the amount of which will be adjusted upward or downward depending on the

---

4. The Debtors provided the Court with copies of financing statements filed by ALI in the Broome County clerk's office on December 17, 1996, and December 31, 1996, with respect to the two trailers. *See* Exhibit "J" attached to Whalen Affidavit.

amount realized upon the sale of the trailers at a private sale or public auction.

## DISCUSSION

 The Debtors have the burden of demonstrating that the transaction was other than what it purports to be in the Agreement. *See In re Edison Bros. Stores, Inc.,* 207 B.R. 801, 812 and n. 14 (Bankr.D.Del. 1997). Whether a lease is intended as security (thus, a conditional sale) or as a "true" lease is a matter of state law. *See id.* at 807. The Agreement does not contain a choice-of-law provision. Both parties do business in New York and the Agreement was executed in New York. New York clearly has an interest in the transaction and, therefore, the Court will apply the law of New York to determine the true nature of the Agreement.

██ Section 1–201(37) of the New York Uniform Commercial Code ("NYUCC")[5] includes the following expressed provisions setting forth a list of relevant factors to be considered in determining whether a transaction created a security interest in the property or was intended to create a lease:

> Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
>
> (a) the original term of the lease is equal to or greater than the remaining economic life of the goods,
>
> (b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

> (d) the lessee has an option to become the owner of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement.
>
> A transaction does not create a security interest merely because it provides that:
>
> (a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,
>
> (b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording or registration fees, or service or maintenance costs with respect to the goods,
>
> (c) the lessee has an option to renew the lease or to become the owner of the goods,
>
> (d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or
>
> (e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

NYUCC § 1–201(37) (McKinney's Supp. 1997–98).

While NYUCC § 1–201(37) clearly indicates that the Court is to examine the facts of each case in characterizing a transaction, *see Edison Bros.,* 207 B.R. at 809 (applying New York law and citing *International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 751 (2d Cir.1991); *In re Pan Am Corp.,* 130 B.R. 409, 413 (S.D.N.Y. 1991); *All Good Leasing Corp. v. Bimco Indus. Inc.,* 143 A.D.2d 788, 533 N.Y.S.2d 336, 337 (1988)), the first paragraph of the amended statute qualifies this by setting out a bright line test whereby, as a matter of law, a transaction creates a security interest. Thus, if the Debtors do not have a right to terminate the purported lease prior to the

---

5. NYUCC § 1–201(37) was amended in 1994 and was made applicable to lease contracts made or effective on or after June 30, 1995. *See* NYUCC § 1–201(37) (McKinney's Supp.1997–98). The

Agreement was executed on or about December 5, 1996, and, therefore, the 1994 amendment to NYUCC § 1–201(37) is applicable to the discussion herein.

expiration of its term, then the Court is to examine whether any of four other enumerated conditions have been met which would establish that the parties entered into a security agreement, as the Debtors contend.

In this case, Section Three of the Agreement expressly permits the Debtors to terminate the lease on any Anniversary Delivery Date. Their obligation for the payment of rent is also terminated although subject to final adjustment upon the sale of the trailers by ALI pursuant to Section Nine. Therefore, the Court need not examine the other four factors in finding that at least as a matter of law the Agreement did not create a security interest. However, those same four factors are relevant in the Court's consideration of the facts of the case.

■ New York courts have considered a number of factors within an agreement when making a determination whether the transaction represents a conditional sale or a "true" lease. *See Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258, 1262 (7th Cir.1991), citing *Matthews v. CTI Container,* 871 F.2d 270, 275–76 (2d Cir.1989) and *Guardsman Lease Plan, Inc. v. Gibraltar Transmission Corp.,* 129 Misc.2d 887, 494 N.Y.S.2d 59, 63–64 (N.Y.1985); *see also Matter of Marhoefer Packing Co., Inc.,* 674 F.2d 1139, 1145 (7th Cir.1982) (setting forth four factors relevant to the issue); *In re Loop Hosp. Partnership,* 35 B.R. 929, 935–36 (Bankr.N.D.Ill.1983) (identifying a "laundry list" of seven factors to be considered in addressing whether a lessor had "shifted his residual value in the property to the lessee and thereby created a security agreement"); *Matter of Brookside Drug Store, Inc.,* 3 B.R. 120, 122–23 (Bankr. D.Conn.1980) (listing 15 factors).[6] The main focus of the courts has been on "(1) whether the purchase option price at the end of the lease term is nominal, (2) whether the lessee is required to make aggregate rental payments having a present value equaling or exceeding the original cost of the leased property, and (3) whether the lease term covers the total useful life of the equipment." *See Edison Bros.,* 207 B.R. at 809–810 (cita-

tions omitted). Accordingly, the Court will examine the latter three factors.

■ It is presumed that an agreement is a disguised security agreement if it explicitly provides that the lessee has the option to purchase the leased goods for nominal consideration. *See id.* at 810 (citations omitted). The fact that the Agreement does not contain an option to purchase does not necessarily mean that the agreement is a "true" lease, however. *See In re Telemax Corp.,* 10 U.C.C. Rep.Serv. 1316, 1320 (Bankr.S.D.N.Y. 1971). At the same time, if the lessee is able to obtain the property only by paying the fair market value at the conclusion of the lease term, then the inference is that the option price is not nominal and the agreement is a true lease unless it can be shown that the fair market value is negligible. *See Edison Bros.,* 207 B.R. at 810 (citations omitted). Despite the Debtors' contention that they have an option to purchase the trailers, the Court finds no expressed provision in the Agreement which gives the Debtors such an option. The only "option" they have if they wish to retain the use of the trailers is to purchase them at a private or public sale as acknowledged by ALI's counsel. In the absence of any proof that the fair market value of the trailers would be negligible at the end of the 60 months, this factor supports ALI's position that the transaction represents a true lease.

■ The second principal factor considered by the majority of courts is whether the lessee is required to make aggregate rental payments having a present value equaling or exceeding the purchase price of the property. *See id.* at 814 (citations omitted). As the court in *Edison Bros.* noted,

The rationale behind this second factor is that if the alleged lessee is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased goods plus an interest charge over the term of the alleged lease agreement, a sale is likely to have been intended since what the lessor will receive is more than a payment for

---

6. Because the Uniform Commercial Code ("UCC") has been adopted by a majority of states, decisions from other jurisdictions inter-

preting the same provisions of the UCC are relevant to this Court's analysis. *See Edison Bros.,* 207 B.R. at 809 n. 7.

the use of the leased goods and loss of their value; the lessor will receive a consideration that would amount to a return on its investment.

*Id.* The analysis requires the Court to compare more than simply the aggregate rental payments with the purchase price of the goods at the inception of the lease. It requires a comparison of the present value of the rental payments to the fair market value or purchase price. *See id.*

NYUCC § 1–201(37) defines "present value" as

the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

NYUCC § 1–201(37) (McKinney Supp.1997–98).

The 1996 Great Dane trailer was purchased by ALI for $44,360, and the 1997 Great Dane trailer was purchased for $47,385. The payments on the 1996 trailer over 60 months amount to $49,798.80 (60 X $829.98) and on the 1997 trailer over 60 months amount to $53,194.20 (60 X $886.57), or a total of $1,716.55/month or $102,993 over 60 months. Although the Debtors failed to provide a calculation of present value, they did provide the Court with an amortization schedule using an interest rate of 8.89%. *See* Exhibits "E" and "I" of Debtors' Opposition The rate does not appear "manifestly unreasonable" and, therefore, the Court will utilize this rate in its calculation of present value ("PV") using the formula: PV = Payment–[Payment/](1 + interest) n/interest.
Payment = $1,716.55/month for both trailers; interest = .0889/12 = .0074, and n = 60.[7] *See* VINCENT J. LOVE, UNDERSTANDING AND USING FINANCIAL DATA: AN ERNST & YOUNG GUIDE FOR ATTORNEYS 136–45 (John Wiley & Sons, ed.1992). Present value is

calculated to be $82,924 for $102,993 in total payments over 60 months. The present value of the payments is less than the purchase price of the trailers ($82,924 v. $91,745). This would indicate that the transaction was intended to be a true lease, rather than a sale.

Addressing the third factor, the Court notes that at the hearing, the assertion was made that the economic life of the trailers extended beyond the 60 month term of the lease. The Debtors offered no evidence to contradict this statement. The Agreement does not bind the Debtors to renewing the lease for the remaining economic life of the trailers. Indeed, the Agreement does not give the Debtors the option to renew the lease for the remaining economic life of the trailers, whether for no additional consideration or nominal additional consideration. This gives credence to ALI's contention that the lease is, indeed, a "true" lease.

The Court also acknowledges that the labeling of the Agreement as a "lease" and referring to the parties as "lessor" and "lessee" in and of themselves are not controlling. *See In re Chicago Coastal Motor Express, Inc.*, 1992 WL 309184 at *2 (Bankr.N.D.Ind.1992) (citation omitted). The fact that the Agreement permits the execution and filing of a financing statement is not determinative that the lease was intended to create a security interest in favor of ALI either. *See id.* Nor does the fact that ALI filed financing statements in connection with the Agreement persuade the Court that it was ALI's intent to sell the trailers to the Debtors while reserving a security interest in the property. Rather, the Court finds that the filing of the financing statement was the result of an overabundance of caution to assure that its rights were protected. Indeed, Schedule "A" attached to the financing statements indicates that "This financing statement does not constitute and should not be construed as an admission that the lease between the Secured Party (the Lessor in the lease) and the Debtor (the Lessee in the lease) is a security agreement." *See* Exhibit "J" of Debtors' Opposition.

---

7. According to the Court's calculations, $(1+.0074) n = 1.55638.$

Some courts have found it relevant that the lessor entered into the transaction without any property to lease and the lessor's only concern was to finance the purchase of the property at a profitable return. *See Orix Credit,* 946 F.2d at 1263, citing *Citi–Lease Co. v. Entertainment Family Style, Inc.,* 825 F.2d 1497, 1500 (11th Cir. 1987). In this case, ALI purchased the trailers from Lancaster Equipment Corporation at or shortly after the time the Agreement was executed. This Court agrees with Bankruptcy Judge Peter J. Walsh's view in *Edison Bros.* that "the fact that the role of the lessor is that of a financier is inconclusive to show that a disguised secured transaction was intended because this kind of three party transaction is typical in true leases as well as in installment sales." *See Edison Bros.,* 207 B.R. at 821 (citations omitted).

The court in *Coastal Motor Express* emphasized the fact that at the termination or expiration of the lease the lessor was required to sell the vehicles. *See Coastal Motor Express,* 1992 WL 309184 at *19. The court noted,

> The fact that Associates is obligated to extinguish its ownership rights in the leased vehicles at the termination or expiration of the lease clearly smacks of an instruct in the nature of a security interest, rather than as a true lease. One of the characteristics of a lease is that at the end of the term, the owner has an absolute right to retake control and use the property.

*See id.* (citation omitted). While Sections Three and Nine of the Agreement do provide for the sale of the trailers upon termination or expiration of the lease by the Debtors, there is nothing before the Court to indicate that ALI has any use for the trailers and, as an owner, would want to do anything but sell or lease them upon termination or expiration of the lease as provided in the Agreement. The Court also notes that Section Fourteen gives ALI the right to terminate the lease upon the Debtors' default and to *either* sell or lease the trailers. This certainly evidences some indicia of ownership.

The court in *Coastal Motor Express* also relied on the fact that the lessor was required to pay the debtor for any surplus derived from the resale of the property, while recognizing that the debtor also remained liable to the lessor for any deficiency as well. *See Coastal Motor Express,* 1992 WL 309184 at *20–21. However, with the enactment in 1992 of § 397–b of the New York Vehicle and Traffic Law ("NYV & TL") and made effective August 7, 1992, it is evident to this Court that at least in New York such a provision in an agreement in and of itself is no longer determinative of a security interest in the lessor.

The statute expressly provides that

> Notwithstanding any other provision of law, in the case of motor vehicles or trailers which are not vehicles or trailers leased or used primarily for personal, family, or household purposes, a transaction does not create a conditional sale or security interest merely because it provides that the rental price is permitted or required to be adjusted under the agreement either upward or downward by reference to the amount realized upon sale or other disposition of the motor vehicle or trailer.

The Court was unable to discover any cases addressing this particular statute. However, according to G. Oliver Koppell, Chairperson of the Judiciary Committee, New York State Assembly, who introduced the underlying bill, the intent of the legislation was "to provide that fleet leasing contracts that contain TRAC provisions are true leases and should be accorded the same treatment in the area of bankruptcy which currently exists in the area of taxation. . . . TRAC leasing is a commercial custom and has been specifically validated as such in our federal tax laws. See 26 U.S.C. § 770(h)." *See* Letter of July 22, 1992, addressed to Elizabeth D. Moore, Counsel to Governor Mario Cuomo, referencing S.9643/A. 11882, found in the Bill Jacket for L.1992, c. 787. In a letter from Edwin E. Huddleson, III, counsel for the American Automotive Leasing Association, it was explained that "[t]he objective of TRAC vehicle leases is to provide a financial incentive for the lessee/user, who is the party to the transaction best able to control the maintenance of the vehicle, to keep the vehicle in good repair. * * * We

therefore seek New York state legislation clarifying the status of TRAC motor vehicle leases, in major part because of its impact on federal bankruptcy cases." *See* Letter of February 7, 1992, addressed to Assemblyman Koppell, found in the Bill Jacket for L. 1992, c. 787.

In support of their position, the Debtors rely on *In re Pacific Express, Inc.*, 780 F.2d 1482 (9th Cir.1986). *See* Debtors' Supplemental Memorandum of Law, filed January 2, 1998. In its correspondence to Assemblyman Koppell in support of the enactment of NYV & TL § 397–b, counsel for the American Automotive Leasing Association specifically references *Pacific Express* and the problems caused by such decisions in which a TRAC lease is viewed as a sale or security interest and the trustee in bankruptcy is allowed either to keep the vehicles without paying rent or to sell the vehicles. It is evident that the legislature intended to ensure that a lease containing a "terminal rental adjustment clause" in the context of a commercial transaction was presumed to be a "true" lease in the absence of other evidence to the contrary. The cases cited by the Debtors in support of their assertion that the Agreement represents a conditional sales contract, namely, *In re Crummie*, 194 B.R. 230 (Bankr.N.D.Cal.1996), *In re Lewis*, 185 B.R. 66 (Bankr.N.D.Cal.1995), *In re Steffen*, 181 B.R. 981 (Bankr.W.D.Wash.1995), *In re Keblish*, 180 B.R. 176 (Bankr.E.D.Tex.1995), and *In re Cox*, 179 B.R. 495 (Bankr.N.D.Tex. 1995), are inapplicable to the matter herein as they address non-commercial leases of personal vehicles. In enacting NYV & TL § 397–b, the legislature was careful to distinguish between those motor vehicle leasing contracts for vehicles or trailers leased or used primarily for personal, family or household purposes and those leased or used for commercial purposes. The Debtors were operating a trucking business, and the contracts were executed in their names, doing business as C & J Express Co. There is nothing before the Court which would lead it to conclude that the trailers were for anything but commercial use and, therefore,

NYV & TL § 397–b is applicable to the matter presently before the Court.

Beginning with the presumption that a lease containing a "terminal rental adjustment clause" in the context of a commercial transaction in New York is presumed to be a "true" lease, the Court concludes that the Debtors have failed to establish that the Agreement is not a "true" lease but instead is an installment sales contract, particularly in view of the additional findings supporting the presumption, namely, that

1. There is no option to purchase the trailers for no additional consideration or nominal consideration.

2. The term of the lease is for less than the economic life of the trailers.

3. There is no requirement that the Debtors must renew the lease for the remaining economic life of the trailers.

4. The present value of the Debtors' payments is less than the purchase price of the trailers.

5. The Debtors have the option to terminate the lease prior to the expiration of the five year lease term on any Anniversary Delivery Date.

6. The Debtors were not required to pay a substantial non-refundable security deposit.[8] *See Leasing Serv. Corp. v. Am. Nat'l. Bank & Trust Co.*, 199 UCC Rep.Serv. 252, 260 (D.N.J.1976) (noting that a requirement that the lessee pay a substantial deposit is indicative of a conditional sales).

Based on the foregoing, it is hereby

ORDERED that the Debtors shall have thirty (30) days from the date of this Order to either assume or reject the Agreement pursuant to Code § 365(b)(1) and (d)(2).

ORDERED that the Debtors shall have thirty (30) days from the date of this Order to either assume or reject the Agreement pursuant to Code § 365(b)(1) and (d)(2).

---

8. According to Section Two of the Agreement, the Debtors were required to make an advance payment to ALI in the amount of one month's rent per trailer.