

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-14-2003

# In Re Pillowtex

Precedential or Non-Precedential: Precedential

Docket No. 02-2674

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re Pillowtex " (2003). *2003 Decisions.* Paper 83.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/83

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2674

In re: PILLOWTEX, INC. ET AL.

DUKE ENERGY ROYAL, LLC
Appellant

v.

PILLOWTEX CORPORATION
Appellee

On Appeal from the United States District Court
for the District of Delaware
(Civil Action Nos. 00-CV-4211)
District Judge: The Honorable Sue L. Robinson

Argued: April 10, 2003

Before: ALITO and FUENTES, *Circuit Judges*
and PISANO,* *District Judge*

(Opinion Filed: November 14, 2003)

Eric D. Schwartz
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

* The Honorable Joel Pisano, United States District Judge for the District
of New Jersey, sitting by designation.

Daniel P. Winnika [ARGUED]
Jones, Day, Reavis & Pogue
2727 North Harwood Street
Suite 100
Dallas, TX 75266

*Counsel for Appellee*

Brett D. Fallon [ARGUED]
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306, 10th Floor
Wilmington, DE 19899

*Counsel for Appellant*

---

## OPINION OF THE COURT

---

FUENTES, *Circuit Judge*:

Duke Energy Royal LLC ("Duke") appeals from an order of the District Court denying a motion to compel Pillowtex Corporation ("Pillowtex" or "debtor") to make lease payments owing under the Master Energy Services Agreement ("MESA"), an agreement its predecessor entered into with Pillowtex.[1] The District Court denied Duke's motion on the grounds that the MESA was not a true lease, but rather a secured financing arrangement. The sole issue in this appeal is whether the District Court correctly determined that the MESA entered into between Pillowtex and Duke prior to Pillowtex's bankruptcy filing was a secured financing arrangement rather than a true lease. We affirm because we agree with the District Court that, based on the economic realities of the underlying transaction, the MESA was a secured financing arrangement.

---

1. On April 30, 2002, DukeSolutions, Inc., a party to the MESA, transferred its claims against Pillowtex to appellant, Duke Energy Royal LLC ("Duke Royal") pursuant to a Bill of Sale, Assignment and Assumption Agreement. (App. at 251-52). To simplify, we refer to both simply as "Duke."

## I. *Facts and Procedural Background*

Because the nature of the MESA is at issue, we first turn to its provisions and the transaction underlying the agreement. Pillowtex and Duke entered into the MESA on June 3, 1998. Pursuant to the MESA, Duke agreed to install certain equipment "for the purpose of improving the efficiency of energy consumption or otherwise to reduce the operating costs" incurred by Pillowtex at its facilities. (MESA § 2.5, App. at 299). The MESA covered two different sets of energy services projects, one involving production equipment and the other energy-savings equipment. The production equipment was provided to Pillowtex by Duke pursuant to separate stand-alone agreements, which were recorded as true leases on Pillowtex's books, and which the parties agree constituted true leases. Therefore, only the nature of the parties' arrangements concerning the energy-savings equipment is at issue in this appeal.

The energy-savings equipment included certain lighting fixtures, T8 lamps and electronic ballasts (collectively the "lighting fixtures"), which were installed in nine of Pillowtex's facilities and a new wastewater heat recovery system that included hot water heating equipment (the "wastewater system" and together with the lighting fixtures, the "energy fixtures"), which was installed at Pillowtex's Columbus, Georgia plant. The lighting fixtures were selected, and the wastewater system was constructed, specifically for Pillowtex's facilities. (App. at 336-590).

In order to induce Pillowtex to enter into the energy services projects, Duke offered to originate funding for the production equipment "on a two-to-one basis (*i.e.*, for every $1 million of energy projects Duke would originate $2 million for funding of equipment) with a minimum of $28 million in funding for equipment leasing or financing." (App. at 153). Another incentive Pillowtex had for entering into the agreement was "that the energy projects would be cost neutral to Pillowtex for the term of the agreement; that is, Pillowtex's payments to Duke would be equivalent to Pillowtex's actual savings . . . and Pillowtex would then reap the benefits from the cost savings after the end of the term of the project." (App. at 153). In keeping with this

arrangement, Pillowtex accounted for its payments to Duke under the MESA as a utility expense. (App. at 155).

The MESA provided that the cost of acquiring and installing the energy fixtures would be paid by Duke, which incurred total costs of approximately $10.41 million. (MESA § 5, App. at 302; 339). Of this amount, approximately $1.66 million was for material and labor costs for the wastewater system. (App. at 594). Approximately $4.46 million was for labor to install the lighting fixtures and $4.29 million was for material costs for the lighting fixtures, which is to say that the cost of labor to install the fixtures was higher than the cost of the actual materials themselves. (App. at 339, 70). Also, Duke paid approximately $223,000 to dispose of light fixtures and related equipment that it removed from Pillowtex's facilities. (App. at 69-70).

In exchange, Pillowtex was to pay Duke on a monthly basis one-twelfth of Pillowtex's annual energy savings, in an amount the parties agreed to in advance, until the end of the MESA's 8 year term. (MESA § 7.0, App. at 304). In addition, the parties agreed that the simple payback of all of Duke's costs was not to exceed 5 years. (MESA § 4.1(f), App. at 302). "Simple payback" is synonymous with "payback period," an accounting term which refers to "[t]he length of time required to recover a venture's initial cash investment, without accounting for the time value of money." BLACK'S LAW DICTIONARY 1150 (7th ed. 1999). In other words, the payments were structured to ensure that Pillowtex would make predetermined, equal monthly payments and that Duke would recover its costs 3 years prior to the end of the term of the MESA. Although the MESA was for an 8 year term, the parties agree that the useful life of the energy fixtures was 20-25 years. (App. at 74-75).

It is undisputed that Duke and Pillowtex intended to structure the MESA to have the characteristics of a lease and that the parties were trying to create a true lease. Indeed, Pillowtex's counsel conceded during oral argument before the District Court, "I don't disagree that [the MESA] was structured to have those characteristics for tax purposes and, you know, to [the] extent they could, the parties were trying to create a true lease, I would admit

that." (App. at 117). The parties intended for the MESA to be structured as a true lease, in large part, because Pillowtex was subject to capital expenditure limitations under its senior credit facility and did not wish to have the energy-savings equipment count as capital expenditures under that facility. Nevertheless, the MESA is not labeled a lease and it does not refer to the parties as lessee and lessor. Also, Duke alleges that the parties were concerned with structuring the MESA's provisions relating to energy-savings equipment in accordance with the requirements of Financial Accounting Standard 13, which sets the standards for financial accounting and reporting for leases. (App. at 164). However, the MESA fails to qualify as a true lease under ¶ 7 of that standard because the present value of the total payments due under the MESA exceeds the value of the original cost of the energy fixtures. (App. at 171).

In keeping with their intent to structure the transaction as a lease, the MESA provides that title to the equipment would remain with Duke. (MESA § 11.0, App. at 308). Also, Pillowtex agreed not to claim ownership of the equipment for income tax purposes, (MESA § 9.13(ii), App. at 307), and Pillowtex was not obligated to purchase the equipment at the end of the term of the MESA. Rather, the MESA provided the following four options to Duke at the conclusion of its term, if Pillowtex was not then in default:

> (I)  remove the Equipment installed and replace those [sic] Equipment with equipment comparable to those originally in place, provided that no such replacement shall be required with respect to Production Equipment; or,
>
> (ii)  abandon the Equipment in place; or,
>
> (iii)  continue this Agreement until the expiration of the term hereof and then extend the term of this Agreement for such additional period(s) and payment terms as the parties may agree upon; or,
>
> (iv)  [g]ive the Customer the option of purchasing all (but not less than all) of the Equipment at a mutually agreed upon price.

(MESA § 8.3, App. at 304). If Duke elected to exercise option (I), it was bound to "be responsible for all costs and expenses in removing such Equipment, including costs to repair any damage to [Pillowtex's] Facility caused by such removal." (*Id.*)[2] Despite the existence of the option for Duke to repossess the equipment, Pillowtex's Vice President for Engineering, Michael Abba, testified that in his understanding, there was no chance of that option being exercised:

> It was clearly my understanding that Duke would abandon the Lighting Fixtures and the Wastewater System at the conclusion of the MESA and in fact statements were made to me by Duke sales personnel to that effect. Moreover, because the energy projects were of no economic benefit to Pillowtex until the end of the term when Pillowtex would reap the energy savings going forward, I would not have signed off on the projects if the Lighting Fixtures and Wastewater System were not to be abandoned. I also believe that, based on the prohibitive cost of removing and replacing the Lighting Fixtures and the Wastewater System for Pillowtex, Duke [had] no choice but to abandon the Lighting Fixtures and the Wastewater System at the end of the term of the MESA.

Abba Affidavit at ¶ 6 (App. at 155).

After Duke and Pillowtex executed the MESA, Duke entered into a Master Lease Agreement ("Master Lease") with General Electric Capital Corporation ("GECC"), dated August 2, 1999, pursuant to which GECC agreed to finance the lighting fixtures for four of the nine Pillowtex facilities in which Duke was to install new fixtures pursuant to the MESA. Concurrently with the execution of the Master Lease and the execution of an equipment schedule listing lighting fixtures subject to the Master Lease, Duke and GECC entered into a Collateral Assignment Agreement through which Duke granted GECC a security interest in all of Duke's rights and interests in the MESA, including Duke's

---

2. In the event of a default by Pillowtex, Duke would have the right to remove the equipment at Pillowtex's expense, without being obligated to replace it, and could terminate the MESA. (MESA § 13.2, App. at 309).

right to payment under the MESA, as security for Duke's obligations under the Master Lease. Also, in connection with the Master Lease transaction, Pillowtex executed an Acknowledgment Letter which provides that its interest in the MESA and equipment covered by it "is subject and subordinate to [GECC's] rights under . . . the Master Lease Agreement . . . between GECC and Duke." (App. at 749). Shortly after Duke and GECC entered into the Master Lease, on August 12, 1999, GECC and SouthTrust Bank executed a Master Assignment Agreement, pursuant to which GECC assigned all of its rights and interests in the Master Lease and the Collateral Assignment it had with Duke, as well as the MESA and certain other documents, to SouthTrust. Therefore, with respect to the lighting fixtures, SouthTrust holds the rights and interests under the MESA for the lighting fixtures at four of Pillowtex's facilities and Duke holds the rights and interests under the MESA for the lighting fixtures at the other five facilities.

On November 14, 2000, Pillowtex and certain of its subsidiaries filed petitions for relief under Chapter 11 of the Bankruptcy Code. Thereafter, Pillowtex stopped making payments due under the MESA. On February 21, 2002, Duke filed a motion under section 365(d)(10) of the Bankruptcy Code to compel Pillowtex to make lease payments on the equipment it had provided to Pillowtex under the MESA. Section 365(d)(10) requires debtors-in-possession, such as Pillowtex, to "timely perform all of the obligations of the debtor . . . first arising from or after 60 days after the order for relief in a case under Chapter 11 . . . under an unexpired lease of personal property . . . until such lease is assumed or rejected . . . ." 11 U.S.C. § 365(d)(10).[3] In response to Duke's motion, Pillowtex filed

---

3. Although § 365(d)(10) refers to the obligation of a trustee to make lease payments, its provisions apply to Pillowtex because the Bankruptcy Code provides that debtors-in-possession, such as Pillowtex, are to perform all of the functions and duties of a Chapter 11 trustee. *See* 11 U.S.C. § 1107(a).

In addition to seeking an order compelling Pillowtex to make lease payments, Duke sought an order requiring Pillowtex to provide adequate protection of its interest in the equipment pursuant to 11 U.S.C. § 363(e)

an objection in which it argued that Duke was not entitled to payment of post-petition monthly obligations, which Pillowtex represented amounted to $1.8 million, because the MESA was not a true lease. After a hearing on the matter, the District Court, sitting in Bankruptcy, denied Duke's motion.[4] Duke timely appealed.

## II. *Jurisdiction and Standard of Review*

The District Court had subject matter jurisdiction over Duke's motion to compel pursuant to 28 U.S.C. § 1334(a), which provides district courts with subject matter jurisdiction over bankruptcy cases.[5] This Court has jurisdiction to review the District Court's order of June 4, 2002 pursuant to 28 U.S.C. § 1291.

Our standard of review over the District Court's bankruptcy decision is the same as that exercised by the District Court. *E.g.*, *In re Woskob*, 305 F.3d 177, 181 (3d Cir. 2002). Accordingly, we review the Bankruptcy Court's findings of fact for clear error and exercise plenary review over the Bankruptcy Court's legal determinations. *Id.*

## III. *Analysis*

Whether an agreement is a true lease or a secured financing arrangement under the Bankruptcy Code is a question of state law. *In re Continental Airlines, Inc.*, 932

---

or, in the alternative, relief from the automatic stay in order to pursue its state law remedies to recover possession of the equipment. Section 363(e) mandates that adequate protection be provided to entities which have an interest in property used by the trustee or debtor-in-possession and "applies to property that is subject to any unexpired lease of personal property." *See* 11 U.S.C. § 363(e).

4. In the same order, the District Court also denied a similar motion filed earlier in the course of the bankruptcy proceedings by SouthTrust. We review the decision below only insofar as it pertains to Duke because SouthTrust did not appeal the District Court's order.

5. The District Court exercised its original jurisdiction over bankruptcy cases, as opposed to its appellate jurisdiction over appeals from bankruptcy courts.

F.2d 282, 294 (3d Cir. 1991) (citing H.R. Rep. No. 95-595, at 314 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6271). In this case, the parties agreed that the MESA would be interpreted, performed, and enforced in accordance with the laws of the State of New York. (MESA, Appendix A, § 17.7). Accordingly, we turn to New York law in order to resolve whether the MESA constitutes a secured financing arrangement or a lease. Under New York law, because Pillowtex is seeking to characterize the MESA as a secured financing arrangement rather than a lease, Pillowtex bears the burden of proof on that issue. *In re Owen*, 221 B.R. 56, 60 (Bankr. N.D.N.Y. 1998).[6]

Article 2A of the New York Uniform Commercial Code explains that a lease is "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale . . . or retention or creation of a security interest is not a lease." N.Y. U.C.C. § 2-A-103(1)(j) (McKinney 2002). Thus, the definition of a lease expressly excludes security interests. The exclusion of security interests from the definition of a lease requires that we turn to the U.C.C. definition of a security interest.[7]

6. Pillowtex argues that Duke should bear the burden of proof because it was Duke that sought relief on the theory that the MESA is a lease. Pillowtex asserts that *Owen* is distinguishable because, whereas the agreement at issue in *Owen* was labeled a lease and identified the parties as lessee and lessor, the MESA does neither and therefore does not purport to be a lease. Pillowtex maintains that its argument does not recharacterize the MESA and it should not, therefore, bear the burden of proof. We disagree. Although the MESA is not labeled a lease and does not identify the parties as lessee and lessor, Pillowtex conceded at oral argument before the District Court that the parties structured the MESA to have the characteristics of a lease for tax purposes and were trying to the extent they could to create a true lease. While we ultimately conclude that the intent of the parties and the structure of the MESA are not dispositive as to whether a transaction created a lease or a secured financing arrangement, the intent of the parties and structure of the MESA indicate that it is Pillowtex which is seeking to recharacterize the MESA as something other than what it purports to be and, therefore, Pillowtex bears the burden of proof.

7. *See* U.C.C. § 1-201(37), Official Cmt. ("Lease is defined in Article 2A as a transfer of the right to possession and use of goods for a term, in return for consideration. Section 2A-103(1)(j). The definition continues by stating that the retention or creation of a security interest is not a lease. Thus, the task of sharpening the line between true leases and security interests disguised as leases continues to be a function of this section").

Section 1-201(37) of the U.C.C. provides that a security interest "means an interest in personal property or fixtures which secures payment or performance of an obligation." N.Y. U.C.C. § 1-201(37). After defining the term "security interest," section 1-201(37) sets out a test for determining whether a transaction creates a lease or a security interest. Section 1-201(37) begins by noting that whether a transaction creates a lease or a security interest is to be determined on a case-by-case basis. After indicating that courts are to examine the facts of each case in order to characterize a transaction, the statute sets out a bright-line test, sometimes referred to as a per se rule, for determining whether a transaction creates a security interest as a matter of law. Specifically, section 1-201(37) provides:

> (a) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, **and**:
>
>> (I) the original term of the lease is equal to or greater than the remaining economic life of the goods,
>>
>> (ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>>
>> (iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, **or**
>>
>> (iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

N.Y. U.C.C. § 1-201(37) (emphasis added). Thus, under the two-part test set out in New York's U.C.C., if Pillowtex did not have the right to terminate the MESA prior to the end

of its term, *and* any of the four factors set out in section 1-201(37)(a)(I)-(iv) are met, then the MESA would be considered to create a security interest as a matter of law. *See In re Owen*, 221 B.R. at 60-61. If, on the other hand, it is determined that "the transaction is not a disguised security agreement per se, [we] must then look at the specific facts of the case to determine whether the economics of the transaction suggest such a result." *In re Taylor*, 209 B.R. 482, 484 (Bankr. S.D. Ill. 1997) (citation omitted). *See also In re Murray*, 191 B.R. 309 (Bankr. E.D. Pa. 1996); *In re American Steel Prod.*, 203 B.R. 504, 506-07 (Bankr. S.D. Ga. 1996) (describing the standards for determining whether a disguised security arrangement exists).[8] In this case, the District Court went directly to the economic realities of the transaction memorialized in the MESA. In doing so the Court seems to have implicitly held that the MESA was not a disguised security agreement under the bright-line test of section 1-201(37). We agree.

On appeal, Pillowtex argues that the MESA is a secured financing agreement both under this bright-line test and also based on the economics of the MESA transaction. Specifically, Pillowtex argues that the second and fourth factors set out in the second part of the statutory two-part test are present: (1) that at the end of the MESA's term Pillowtex was bound to become the owner of the energy fixtures and (2) that it was bound to become the owner of the fixtures for no or nominal additional consideration upon compliance with the terms of the MESA. Duke concedes that the first part of the two-part test is satisfied: that the MESA prohibits Pillowtex from terminating its obligation to pay Duke the full cost of the energy fixtures before the termination of the MESA's term. However, Duke maintains that none of the four factors in section 1-201(37)(a)(I)-(iv) are present. These factors are hereafter referred to as "residual value factors" because they relate to

---

8. Because N.Y. U.C.C. § 1-201(37) is based on the Uniform Commercial Code, decisions from other jurisdictions interpreting this same uniform statute are instructive. *See, e.g.*, *In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 809 n.7 (Bankr. D. Del. 1997) (applying the reasoning of cases from a variety of jurisdictions to analysis of N.Y. U.C.C. § 1-201(37)); *In re Owen*, 221 B.R. at 61 n.6.

whether residual value will remain for the purported lessor, Duke, at the end of the term of the MESA. *See* E. Carolyn Hochstadter Dicker and John P. Campo, *FF&E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1-201(37)*, 7 Am. Bankr. Inst. L. Rev. 517, 552 (1999).

As an initial matter, we note that the first and third residual value factors are not satisfied. The first factor is whether "the original term of the lease is equal to or greater than the remaining economic life of the goods." N.Y. U.C.C. § 1-201(37)(a)(I). Here, the term of the MESA is eight years and Pillowtex concedes that the expected useful life of the equipment is 20-25 years. Thus, the economic life of the equipment exceeds the term of the MESA by a factor of three and the first residual value factor set out in section 1-201(37) is not met. The third factor indicative of a security interest is met where "the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement." N.Y. U.C.C. § 1-201(37)(a)(iii). This factor is not met because the terms of the MESA do not give Pillowtex the option to renew the lease for the remaining life of the equipment for no or nominal consideration.

As to the second factor, Pillowtex argues that it was bound, if not formally then in a de facto sense, to become the owner of the energy fixtures because the only way that the fixtures would be removed from Pillowtex's facilities is if Duke paid millions of dollars to acquire and install replacements. Along the same lines, Pillowtex argues with respect to the fourth residual value factor that, although the MESA does not expressly give it the option to become the owner of the energy fixtures for no or nominal consideration, in effect it has this option because it can compel Duke to abandon the energy fixtures by refusing to negotiate an extension of the MESA or a purchase of the energy fixtures at the end of the MESA's term.

We agree with Duke that neither the second nor the fourth residual value factors are present here because Pillowtex is not contractually bound to become the owner of the energy fixtures, nor does the MESA provide Pillowtex

with the option to become the owner of the energy fixtures for no or nominal consideration. Rather, the existing options as to how to proceed at the end of the term of the MESA were to be exercised only by Duke. Pillowtex provides no authority for the proposition that a de facto arrangement is enough to satisfy the requirements of section 1-201(37)(ii) and (iv). If anything, the relevant caselaw points us to the opposite conclusion. *See Edison Bros.*, 207 B.R. at 810 ("If the lease agreement *explicitly* provides that the lessee has an option to purchase the leased goods for nominal consideration (e.g., for $1), the agreement is presumed to be a disguised security agreement") (emphasis added). Accordingly, we conclude that none of the four residual value factors set forth in N.Y. U.C.C. § 1-201(37)(a)(I)-(iv) are met.

The parties agree that, where none of the four factors set out in section 1-201(37) are present, courts are to consider the economic reality of the transaction in order to determine, based on the particular facts of the case, whether the transaction is more fairly characterized as a lease or a secured financing arrangement. They also agree that the District Court applied the correct standard for evaluating the economic reality of their transaction. As the District Court explained:

> Under relevant case law, courts will look to various factors in evaluating the "economic reality of the transaction . . . in determining whether there has been a sale or a true lease," *Pactel Fin. v. D.C. Marine Serv. Corp.*, 518 N.Y.S.2d 317, 318 (N.Y. Dist. Ct. 1987), including the following: "[a] whether the purchase option is nominal; [b] whether the lessee is required to make aggregate rental payments having a present value equaling or exceeding the original cost of the leased property; and [c] whether the lease term covers the total useful life of the equipment." *In re Edison Bros. Store, Inc.*, 207 B.R. 801, 809-10 and n.8, 9, 10 (Bankr. D. Del. 1997). *See also* [N.Y. U.C.C.] § 1-201(37) (McKinney Supp. 1996). "In this regard, courts are required to examine the intent of the parties and the facts and circumstances which existed at the time the transaction was entered into." *In re Edison*, 207 B.R. at 809.

*In re Pillowtex, Inc. et al.*, Nos. 00-4211 to 00-4234, slip op. at 5-6 (Bankr. D. Del. June 4, 2002) ("Dist. Ct. Op.") (footnote omitted). The District Court found that the MESA was substantively better characterized as a security agreement than a true lease because the second *Edison Bros.* factor clearly weighed in Pillowtex's favor, and the first and third factors were largely neutral. We agree with the District Court's conclusion in this regard.

Specifically, with respect to the second factor, Duke concedes that the aggregate rental payments owing by Pillowtex under the MESA had a present value equal to or exceeding the cost of the energy fixtures. The *Edison Bros.* court cogently explained the importance of such a fact in showing the existence of a security agreement:

> The rationale behind this second factor is that if the alleged lessee is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased goods plus an interest charge over the term of the alleged lease agreement, a sale is likely to have been intended since what the lessor will receive is more than a payment for the use of the leased goods and loss of their value; the lessor will receive a consideration that would amount to a return on its investment.

*Edison Bros.*, 207 B.R. at 814 (*quoted in Owen*, 221 B.R. at 61-62). Applying that logic to this case, Duke has already been well-compensated for the transferral of the lighting fixtures to Pillowtex, undercutting the proposition that the fixtures were merely leased.

Like the District Court, we are unpersuaded by Duke's attempt to rely on the first and third *Edison Bros.* factors. With respect to the first factor, Duke points out that the MESA provides that it "has the option to . . . give [Pillowtex] the option of purchasing all (but not less than all) of the Equipment at a *mutually agreed price.*" App. at 304 (emphasis added). Based on this provision of the MESA, Duke asserts that "Pillowtex does not have the option to purchase the Equipment unless Duke offers it such option, and even then only if Pillowtex agrees on a satisfactory price with Duke." Duke's Br. at 21. Duke concludes that,

therefore, the first economic realities factor weighs in favor of a finding that the MESA is a lease. We agree, however, with Pillowtex's contention that, although the MESA nominally required Pillowtex to bargain for an option price, Pillowtex could essentially ensure a nominal option price by refusing to bargain. This refusal would "effectively compel Duke to abandon the [e]nergy [f]ixtures to avoid the exorbitant expense of acquiring and installing replacements." Pillowtex's Br. at 28. Thus, as an economic reality the option price at the end of the MESA was illusory, nullifying the weight of this factor.

With respect to the third factor, Duke observes that the useful life of the energy fixtures is longer than the term of the MESA, and cites to *Edison Bros.* for the proposition that the long life of the fixtures is indicative of a true lease. In relevant part, the *Edison Bros.* court explained that:

> An essential characteristic of a true lease is that there be something of value to return to the lessor after the term. Where the term of the lease is substantially equal to the life of the lease property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale. Conversely, if the lessor expected a remaining useful life after the expiration of the lease term, it can be reasonably inferred that it expected to retain substantial residual value in the leased property at the end of the lease term and that it therefore intended to create a true lease.

207 B.R. at 818 (citations omitted). We agree that under certain circumstances, the fact that transferred goods have a useful life extending beyond the term of the transferring agreement could reveal the transferor's expectation of retaining residual value in those goods. Such an inference would only be proper, however, where the evidence showed a plausible intent by the transferor to repossess the goods.

The economic realities of the particular transaction in this case belie any such intent. Although the useful life of the lighting fixtures is 20-25 years, eclipsing the MESA's 8-year term, it would be unreasonable for Duke to incur the high costs necessary to repossess the fixtures: namely, the

costs associated with removing, scrapping, and replacing the fixtures. Also, the uncontroverted evidence in this case establishes that there is little (if any) market value for used lighting fixtures.[9] In short, it would have made no economic sense for Duke to spend large amounts of money to reclaim the fixtures, especially in the face of poor resale prospects. We therefore conclude that the District Court did not err by discounting the significance of the useful life of the lighting fixtures as compared to the length of the MESA when conducting its analysis of the economic realities of the transaction underlying the MESA. On balance, then, applying the three *Edison Bros.* factors to this case leads us to conclude that the MESA was not a true lease.

Beyond reiterating its arguments on the three factors, Duke argues that (1) the mutual subjective intent of the parties was to structure the MESA as a lease; (2) Pillowtex's accounting for the MESA payments as a utility expense is evidence that it did not treat the MESA as a repayment of

---

9. During the course of the hearing held by the District Court on SouthTrust's motion to compel, counsel for Pillowtex called James Klemic to the stand to testify as an "expert in the used building materials market." App. at 85. Klemic detailed for the Court the processes and costs associated with removing and reselling lighting fixtures as follows:

> We would have to carefully remove the lighting fixtures where they would have to be wrapped, brought down wrapped, stored, transferred to a storage place. The cost would probably be, it's speculative, but it would be somewhere maybe $30-$40 a fixture perhaps, ultimately, depending on how long you had to keep them to sell them, if you could find a market. And again, I've been universally told there is no market, with very minor exception [sic].
>
> Q. And that has been your experience as well?
>
> A. That has been my experience for 17 years, and it's been the experience of major wrecking companies that have been in the business much longer than I have.
>
> Q. Have you actually looked at the lighting fixtures in the debtors' plants?
>
> A. Yes.

App. at 89-90.

debt incurred to purchase the energy fixtures; (3) it is of no consequence that the MESA is not labeled a lease; and (4) Duke maintained a meaningful reversionary interest in the fixtures at the end of the MESA's term. None of these arguments is persuasive to us.

First, Duke argues that the District Court erred by failing to analyze the intent of the parties. Duke asserts that the record shows that the parties structured the MESA so that it would qualify as a lease under relevant accounting standards. That way, Pillowtex would not reduce the amount of credit available to it under its senior credit facility. Duke also cites a statement that counsel for Pillowtex made to the District Court, which Duke characterizes as a concession: "I don't disagree that it was structured to have that, those characteristics for tax purposes and, you know, to the extent that they could, the parties were trying to create a lease, I would admit that." App. at 117.

Duke's intent argument fails, however, because the New York U.C.C. no longer looks to the intent of the drafting parties to determine whether a transfer is a lease or a security agreement. Specifically, the 1992 version of § 1-201(37) directed courts to determine "[w]hether a lease *is intended* as security" (emphasis added); this language was amended in 1995 to read "[w]hether a transaction *creates* a lease or security interest" (emphasis added). In this way, the reference to parties' intent was explicitly omitted. The Official Comment to the amended version confirms the importance of the changed language:

> Prior to this amendment, [s]ection 1-201(37) provided that whether a lease was intended as security (i.e., a security interest disguised as a lease) was to be determined from the facts of each case . . . Reference to the intent of the parties to create a lease or security agreement has led to unfortunate results. In discovering intent, courts have relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria, however, are as applicable to true leases as to security interests . . . Accordingly, amended section 1-201(37) deletes all references to the parties' intent.

U.C.C. § 1-201(37), Official Cmt; *accord In re Murray*, 191 B.R. at 314 (stating that "judicial opinions construing U.C.C. § 1-201(37) and the Official Uniform Commercial Code Comments . . . clearly place the focus of the inquiry under the revised statute on the economics of the transaction rather than on the intent of the parties as had been the emphasis previously").

Duke relies on *Edison Bros.*, 207 B.R. at 809, for the proposition that "[c]ourts are required to examine the intent of the parties and the facts and circumstances which existed at the time the transaction was entered into." *Edison Bros.*, however, explicitly relied on the 1992 version of the statute in looking at intent, and therefore has been superseded by the 1995 version of the U.C.C. Indeed, Judge Walsh, the author of *Edison Bros.*, noted in a later opinion: "I am persuaded by th[e] clear weight of authority that the intent of the parties, no matter how clearly spelled out in the parties' representations within the agreement, can not control the issue of whether the agreement constitutes a true lease or a security agreement." *In re Homeplace Stores*, 228 B.R. 88, 94 (Bankr. D. Del. 1998). Judge Walsh observed that the shift away from intent had been remarked upon by various commentators. *Id.* (citing Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A*, 25 U. Mem. L. Rev. 873, 882 (1995) ("What had been a test of intention has become a test of economic realities; that is, intention has been dropped from section 1-201(37). . . Thus, the parties to a transaction may create a secured transaction under the revised definition even though their every intention was to create a lease")).

Based on the foregoing authority, we are unwilling to characterize the MESA as a lease on the basis that the parties intended it to appear to be one for tax purposes. Duke admonishes the Court in its brief that "[e]quipment leasing between sophisticated commercial entities dealing at arms length for their mutual benefit is an important commercial activity and one that should not be lightly recharacterized." Duke's Br. at 11. This admonition rings hollow in the context of bankruptcy cases, however, because every dollar that is used to pay a purported lessor

depletes the pool of assets available to pay other constituencies of the estate. In other words, refusing to defer to the intent of contracting parties in resolving whether their agreement is a lease is particularly appropriate in bankruptcy, as otherwise the costs of the agreement would be externalized to third-party creditors.

Duke's accounting argument is similarly meritless. Duke argues that the District Court erred by attaching significance to the fact that Pillowtex did not account for the energy projects under the MESA as true leases. Duke argues that Pillowtex's accounting for the MESA payments as a utility expense should instead be viewed as evidence that it did not treat the MESA as a repayment of debt incurred to purchase the energy fixtures.[10] We disagree. Pillowtex's accounting for the MESA payments as utility expenses seems to us to be consistent with the parties' agreement that Pillowtex's payments to Duke under the MESA would be equivalent to Pillowtex's actual savings. Moreover, as the District Court noted in its opinion, Pillowtex "entered into separate Production Equipment leases, each of which was recorded as a true lease on Pillowtex's books." Dist. Ct. Op. at 6. We agree with the District Court that it is significant that, while payments for the energy fixtures were treated as utility expenses by Pillowtex, the agreements with respect to manufacturing and production equipment (which are not at issue in this case) were recorded on Pillowtex's books as true leases. This distinction suggests that Pillowtex did not find it appropriate to record its MESA payments as leases, which bolsters our conclusion that they were not in fact true leases.

Next, Duke argues that the District Court erred by taking into consideration that the MESA was not labeled a lease. The District Court merely observed in passing, however, that "[t]he MESA is not labeled a lease," Dist. Ct. Op. at 9, and that there is no indication that the court relied heavily on this observation. Even if it did rely to some extent on this fact, this reliance was harmless since the economic

---

10. We express no opinion as to whether this accounting practice comports with the provisions of the Internal Revenue Code.

realities independently dictate that the MESA was in fact not a lease. Accordingly, we do not believe that the District Court committed reversible error by mentioning the labeling of the MESA.

Duke goes on to insist that it had a "meaningful residual interest" in the fixtures, such an interest being "the fundamental characteristic distinguishing a lease from a security interest." *E.g.*, *In re Thummel*, 109 B.R. 447, 448 (Bankr. N.D. Okla. 1989). As discussed earlier, however, Duke only has a nominal residual interest, not a *meaningful* one: the combination of the cost of retrieving the fixtures and their poor market value renders the residual interest negligible. Duke claims that we should not "speculate" as to what it might do for economic reasons at the end of the MESA's term, and instead look to the parties' intent at the time of drafting the agreement. As we have mentioned above, however, Duke's argument is backwards: the Court must subordinate the parties' intent to the economic reality that Duke would not have plausibly reclaimed the fixtures at the end of the MESA's term. This is not mere speculation on our part. The uncontroverted evidence shows that removal of the fixtures would be prohibitively expensive, and that the fixtures' value on the market would not make it worth Duke's while to reclaim them. In short, the economic realities analysis not only permits, but *requires* us to examine the state of affairs at the end of the MESA's term.

Finally, Duke asserts that the District Court erred by characterizing the Master Lease between Duke and SouthTrust as a secured financing agreement, as opposed to a lease. The Master Lease applies only to the lighting fixtures that were SouthTrust's collateral and SouthTrust did not elect to appeal the District Court's order. Therefore, the District Court's holding that the Master Lease was a secured financing is not before us on appeal.

## IV.   *Conclusion*

After carefully considering the arguments discussed above and all other arguments advanced by appellant, we conclude that the District Court correctly determined that

the MESA was not a lease and, therefore, that Duke was not entitled to lease payments under 11 U.S.C. § 365(10). We will remand this case to the District Court so that it may determine whether Duke is entitled to adequate protection.[11]

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*

---

11. Pillowtex asserts that the District Court denied Duke's request for adequate protection under section 363(e) of the Bankruptcy Code. Pillowtex reasons that "[b]ecause the Duke [m]otion included the request for adequate protection and the Memorandum Opinion denied the Duke [m]otion *in toto* . . . the Memorandum Opinion necessarily denied Duke's request for adequate protection." Pillowtex's Br. at 10 n.3. Duke responds that the parties did not present evidence on the adequate protection issue at either the hearing on SouthTrust's motion to compel or on Duke's motion to compel because the District Court understood that it would first resolve the lease/secured financing issue and, if it determined that the MESA was a secured financing, then it would hold a separate hearing on the adequate protection issue. Duke's Reply Br. at 12. Additionally, Duke represents to the Court that "[t]he exact value of the Equipment is the subject of a pending proceeding before the Delaware Bankruptcy Court pursuant to Duke's and SouthTrust's motion to value the collateral in light of the District Court's decision that the MESA was a secured financing." *Id.* at 5 n.1. Based on the foregoing, we believe that the District Court anticipated further proceedings on the adequate protection issue.