# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3416
_____

Prospect ECHN, Inc.

*Plaintiff - Appellant*

v.

Winthrop Resources Corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 20, 2022
Filed: July 28, 2023

_____

Before KELLY, WOLLMAN, and KOBES, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Certain healthcare entities entered into a lease agreement and related lease schedules with Winthrop Resources Corporation (Winthrop). Prospect ECHN, Inc. (Prospect) purchased the healthcare entities' assets and later sought to be released from their obligations to Winthrop. After negotiations failed, Prospect filed suit against Winthrop, alleging that the schedules must be recharacterized as security

interests under the Uniform Commercial Code (U.C.C.), as adopted by Minnesota. See Minn. Stat. § 336.1-203 (lease distinguished from security interest). If recharacterized as security interests, Prospect owns the equipment that Winthrop had leased to it and can argue that Winthrop must return any security deposits and excess payments. If the schedules are true leases, however, Prospect owes Winthrop the amounts due under the contracts.

The district court[1] granted summary judgment in favor of Winthrop, concluding that the agreement and schedules constitute true leases and that Prospect had breached them. The court awarded damages to Winthrop and determined that it was entitled to attorneys' fees and costs. We affirm.

## I. Background

Winthrop is a financial services company that leases computer and other equipment to corporate customers. Prospect purchased the following entities' assets in 2016: Eastern Connecticut Health Network, Inc.; Manchester Memorial Hospital; and The Rockville General Hospital, Incorporated (collectively, ECHN).

Winthrop and ECHN had entered into Lease Agreement No. EA112107, which is dated November 21, 2007, and is governed by Minnesota law. The agreement deemed itself a "'FINANCE LEASE' AS THAT TERM IS DEFINED AND USED IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE." Under a finance lease, the lessee selects equipment and suppliers, and the lessor provides funds to purchase the equipment. See Minn. Stat. § 336.2A-103(1)(g) (defining "finance lease," as relevant here, as a lease in which "the lessor does not select, manufacture or supply the goods," but acquires "the goods or the right to possess[] and use the

---

[1]The Honorable Susan Richard Nelson, United States District Court for the District of Minnesota.

goods in connection with the lease"); E. Carolyn Hochstadter Dicker & John P. Campo, FF&E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1-201(37), 7 Am. Bankr. Inst. L. Rev. 517, 524 (1999) ("A finance lease is the product of a transaction among three parties: (i) the supplier of the equipment; (ii) the lessee, who selects the supplier and the equipment; and (iii) the lessor, who supplies the money necessary to purchase the equipment.").

The agreement provided that Winthrop leased to ECHN the right to use the equipment, software, and services set forth in lease schedules agreed to by the parties. The term of each schedule began on the equipment's installation date and continued for the schedule's initial period, during which neither party could terminate and ECHN had an "absolute and unconditional" obligation to pay all charges under the agreement. The term then "continue[d] from year to year thereafter until terminated." The agreement allowed either party to terminate "without cause at the end of the Initial Term or any year thereafter," so long as the party provided written notice "not less than one-hundred twenty (120) days prior to such termination date." Upon termination, ECHN was obligated to return the equipment to Winthrop.

Over the next several years, Winthrop and ECHN entered into the following schedules: B01, B02, 003X, 004X, C01, D01, and D02, all of which incorporated the terms of the agreement. Each schedule listed the equipment, software, and services leased thereunder, as well as the term of the schedule and the monthly lease charge. After signing each schedule, ECHN arranged for the equipment's delivery.

The schedules had initial terms of four or five years. Winthrop had an accounting policy of assigning residual value of 12.5% of its original cost for leases with initial terms greater than forty-four months and no residual value for leases with initial terms of greater than 63 months. Under this policy, the above-listed schedules had a residual value of 12.5% at the end of their initial term. Winthrop's corporate representative testified that the company booked these residual values for accounting

purposes, which required a conservative estimate, and sometimes booked the transactions as having no residual value. The corporate representative further testified that Winthrop accounted for the schedules as sales-type or direct-financing leases under Statement of Financial Accounting Standards No. 13, Accounting for Leases. With respect to the equipment's disposition upon termination, Winthrop would resell the equipment, but—at the time the schedules were entered into—the company had not analyzed the value that the hardware would have at the end of the initial term.

Former Winthrop sales representative Erik Carlsen testified that the initial terms of Winthrop's lease schedules were "always . . . based upon the underlying asset's useful life." In emails to ECHN's director of accounting and taxation in 2009, Carlsen suggested that a schedule under the agreement could be classified as a capital lease under a ruling by the Financial Accounting Standards Board, because "the Initial Term is greater than 75% of the property's economic life. Indeed, the Initial Term and the useful life are the same at 5 years." Carlsen cited the American Hospital Association's publication Estimated Useful Lives of Depreciable Hospital Assets – Revised 2008 ed., which gave certain computer hardware an estimated useful life of five years. Prospect's expert also testified that much of the hardware set forth on the schedules had a useful life of five years. With respect to the "residual recapture" for an earlier schedule not at issue in this case, Carlsen told an ECHN financial analyst in 2011 that there was "no anticipated value" for certain equipment and agreed that the schedule "resemble[d] a $1 out lease."

During the negotiations relating to Schedule B02 in 2012, ECHN sought to include a buy-out option, which would give ECHN the option to acquire the equipment for $1.00 at the end of the lease term. Carlsen refused and referred ECHN to a friend who worked at a bank and was "very good at $1 outs." Carlsen explained that he hoped the bank would be "able to help where Winthrop cannot." Internal emails from 2010 indicate that ECHN understood that Winthrop did not offer $1.00

buy-out leases. As an ECHN vice president/chief information officer explained at the time, Winthrop's leases offered "lower payments during the lease but we don't own the equipment at the end." Similarly, ECHN senior vice president of finance and information in 2010 decided to do "operating leases" for personal computers through Winthrop because it did "not make sense for us to own these at the end [of the lease]."

After acquiring ECHN's rights and obligations under the agreement and schedules in 2016, Prospect inquired in 2018 whether it could be released from its payment obligations related to the schedules whose initial terms had expired. It informally offered $50,000 to $100,000 to be released from its obligations. Further emails were exchanged regarding releasing Prospect from its payment obligations. Winthrop conveyed several written offers in 2018, making its final offer in December 2018, when it offered to close out schedules B01, B02, 003X, and 004X for $1.7 million. Prospect declined, continued making full payments until February 2019, and made a final partial payment in June 2020. Prospect did not return any equipment to Winthrop and admitted that it was still using some of the equipment as of November 2020. It also had disposed of some equipment, including software containing patient information.

Prospect filed suit in 2019, seeking a declaration that the schedules were not true leases, but security interests. Prospect also asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Winthrop counterclaimed for breach of contract. In ruling on cross-motions for summary judgment, the district court determined that the schedules were true leases because, as relevant here: each schedule was subject to termination by Prospect; Prospect had failed to show that the original term of each schedule was greater than the remaining economic life of the equipment; and the economic realities of the transactions indicated that the schedules were leases, not security interests. The district court

awarded $4,824,490.49 in damages and determined that Winthrop was entitled to attorneys' fees and costs.[2]

## II. Discussion

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004). Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The parties agree that Minnesota law governs their dispute and that the U.C.C. applies. See Denn v. First State Bank, 316 N.W.2d 532, 534 (Minn. 1982) ("The Minnesota legislature adopted the Uniform Commercial Code (U.C.C.) in 1965.").

The U.C.C. provides that "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case." Minn. Stat. § 336.1-203(a). Accordingly, although the agreement here holds itself out to be a finance lease, we must look to the substance of the transaction to determine whether it created a "lease" under Article 2A or a "security interest" under Article 9. See Minn. Stat. § 336.2A-102 (Article 2A "applies to any transaction, regardless of form, that creates a lease"); Minn. Stat. § 336.9-109(a)(1) (Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract"); In re Grubbs Constr. Co., 319 B.R. 698, 711–12 (Bankr.

---

[2]The district court determined that Winthrop was entitled to attorneys' fees, but had not yet awarded them when this appeal was taken. The district court has since issued its order on attorneys' fees and costs. See D. Ct. Order of Oct. 4, 2022. Prospect's appeal from that order is being held in abeyance pending resolution of this matter. See Prospect ECHN, Inc. v. Winthrop Res. Corp., No. 22-3210 (8th Cir. filed Oct. 25, 2022).

M.D. Fla. 2005) ("The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of the title, the form of the transaction or the fact that the transaction is denominated as a 'lease.'" (citation omitted)).

"[T]he issue whether a financing transaction denominated as a 'lease' is a true lease or a disguised security agreement is one of the most vexatious and oft-litigated issues under the Uniform Commercial Code." Id. at 709–10; see 4 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform Commercial Code § 30:5 (6th ed. Nov. 2022 Update) (describing the issue as a "fecund source of disputes" that U.C.C. amendments have failed to resolve). The relevant case law has been described as "a disjointed patchwork of decisions that simply cannot be reconciled." In re Uni Imaging Holdings, LLC, 423 B.R. 406, 414 (Bankr. N.D.N.Y 2010) (quoting In re QDS Components, Inc., 292 B.R. 313, 323 (Bankr. S.D. Ohio 2002)). We nevertheless endeavor to apply the U.C.C. to determine whether the district court correctly decided that the agreement and related schedules were true leases.

Before doing so, we note that each schedule includes a variety of hardware, software licenses, and services. Article 2A involves the transfer of "goods," whose definition covers hardware but seems to exclude software licenses, despite an editors' note suggesting otherwise.[3] Under Article 9, a security interest is "an interest in

---

[3]Compare Minn. Stat. § 336.2A-103(1)(h) (defining "goods" to exclude "general intangibles"); Minn. Stat. § 336.2A-103(3) (adopting definition of "general intangible" set forth in Article 9); Minn. Stat. § 336.9-102(42) (defining "general intangible" to include "software"); and Minn. Stat. § 336.9-102 cmt. 4(a) (explaining that the definitions of "goods" and "software" are mutually exclusive) with Minn. Stat. 336.2A-102 cmt. ("A court may apply this Article by analogy to any transaction, regardless of form, that creates a lease of personal property other than goods, taking into account the expressed intentions of the parties to the transaction and any differences between a lease of goods and a lease of other property."); Raymond T. Nimmer, U.C.C. Article 2A: The New Face of Leasing?, 3 DePaul Bus. & Com. L.J.,

personal property or fixtures which secures payment or performance of an obligation." Minn. Stat. § 336.1-201(b)(35). Hardware and software licenses both fall within the "personal property or fixtures" category, but whether software licenses secure payment or performance of an obligation is a difficult question to answer.[4] See Ward & McJohn, supra § 2:15 ("The fact that the licensee acquires Article Nine collateral by virtue of a license does not, however, make the license itself into a security interest."). The U.C.C. simply does not apply when the predominant purpose of the contract is services. See Vermillion State Bank v. Tennis Sanitation, LLC, 969 N.W.2d 610, 620–21 (Minn. 2022). The parties agree that the U.C.C. applies, but did not address its application to software licenses, other than Prospect's assertions that the software licenses had no residual value and that Winthrop never held title to them. We thus primarily consider hardware in our analysis.

---

559, 568 (2005) (discussing "legislating in comments" and explaining that the only "commercially valuable transaction" that would fit into the comment's "personal property other than goods" category is a "license of intellectual property").

[4] Compare Steven O. Weise, The Financing of Intellectual Property Under Revised UCC Article 9, 74 Chi.-Kent L. Rev. 1077, 1083 (1999) ("A licensor's right under a nonexclusive license on default to terminate the license is not a 'security interest.' The same conclusion should result from a review of the rights of a lender to the licensee that obtains termination rights against the licensee.") and Raymond T. Nimmer et al., Information Law § 14:16 (Sept. 2022 Update) ("For non-exclusive licenses, . . . the entire property right always remains with the licensor and there is no reservation of a property right in property otherwise transferred to the licensee.") with Thomas M. Ward & Stephen M. McJohn, Intellectual Property in Commerce § 2:15 (June 2023 Update) ("[I]f 'secures' is read broadly to include any right in the debtor's property that supports or works to facilitate payment," and the nonparty financier has reserved the right to terminate the license on default, that right "satisfies the definition of an Article Nine 'security interest.'").

## A. The U.C.C.'s Bright-Line Test

We begin with the U.C.C.'s two-part bright-line test, which provides, as relevant here:

> (b)    A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
> > (1)    the original term of the lease is equal to or greater than the remaining economic life of the goods; . . . .

Minn. Stat. § 336.1-203(b)(1).[5]  If these conditions are met, the agreement is a security interest as a matter of law.  In re Grubbs Constr. Co., 319 B.R. at 714; see In re Pillowtex, Inc., 349 F.3d 711, 717 (3d Cir. 2003) ("After indicating that courts are to examine the facts of each case in order to characterize a transaction, the statute sets out a bright-line test, sometimes referred to as a per se rule, for determining whether a transaction creates a security interest as a matter of law."); In re Owen, 221 B.R. 56, 60 (Bankr. N.D.N.Y 1998) (explaining that the U.C.C. requires the court to "examine the facts of each case in characterizing a transaction," but qualifies that requirement by setting forth "a bright line test whereby, as a matter of law, a transaction creates a security interest").

Under the first part of the bright-line test, we must determine whether the consideration was "an obligation for the term of the lease" and whether the agreement and schedules were "subject to termination by the lessee."  Prospect argues that the

---

[5]There are four instances in which a "lease creates a security interest" when it "is not subject to termination by the lessee." See Minn. Stat. § 336.1-203(b)(1)–(4). Prospect advances only one—that the original term of the lease is equal to or greater than the remaining economic life of the goods.

schedules were not subject to termination because Prospect could terminate only at the end of the initial term or at the end of each renewal term. Prospect contends that the district court thus should have applied the bright-line test to the initial term, and—assuming the relevant schedule was a true lease for the initial term—the court should have applied the test to each renewal term to determine when the schedule morphed from a lease to a security interest. Prospect claims that the schedules here were "chameleon leases" that changed their character during a renewal term, arguing that its "ability to terminate 'after' a term is irrelevant, as a matter of law." Appellant's Br. 33. We disagree.

Under the agreement's "hell or high water" provision, Prospect had an absolute and unconditional obligation to pay rent throughout each schedule's initial term. The agreement specifically allowed Prospect to terminate at the end of that term or any renewal term, however. Prospect thus could choose to end its payment obligations as soon as the conclusion of each schedule's initial four- or five-year term. Accordingly, its obligation under the agreement was for the *initial* term of the lease, and we read the statute's phrase "term of the lease" to mean the *entire* term. The entire term of any schedule included the initial term and any one-year renewal terms. That Prospect could terminate only once annually after the initial term—and not at any time of its choosing throughout the year—does not mean that the first part of the test is satisfied. Under a strict reading of the statute and the agreement's termination clause, each schedule was "subject to termination by" Prospect. See In re Marhoefer Packing Co., 674 F.2d 1139, 1142 (7th Cir. 1982) (original transaction deemed a lease where the lessee "was given a right to terminate the agreement after the first four years and cease making payments without [the second four-year term and option to acquire the goods for $1.00] ever becoming operative"). Because Prospect could terminate, the agreement and schedules did not create security interests under the U.C.C.'s bright-line test.

## B. Economic Realities Analysis

Having determined that the transactions are not disguised security agreements per se, we now examine "the specific facts of the case to determine whether the economics of the transaction suggest such a result.'" In re Pillowtex, Inc., 349 F.3d at 717 (quoting In re Taylor, 209 B.R. 482, 484 (Bankr. S.D. Ill. 1997)); see Minn. Stat. § 336.1-203(a). "If there is a meaningful reversionary interest—either an up-side right or a down-side risk—the parties have signed a lease, not a security agreement." White, Summers, & Hillman, supra, § 30:14; see In re WorldCom, Inc., 339 B.R. 56, 72 (Bankr. S.D.N.Y. 2006) ("If the lessor does not possess a meaningful reversionary interest, the lessor has no interest in the economic value or remaining useful life of the goods, and therefore the lessor transferred title to the goods, in substance if not in form."). For the reasons set forth below, we conclude that Winthrop maintained a reversionary interest in the hardware listed in the schedules.

Prospect cites Carlsen's testimony and the accounting policies and emails set forth above for the proposition that each schedule's initial term was set to the economic life of the hardware. It also argues that Winthrop classified the schedules as having no residual value under the Financial Accounting Standards Board's rules regarding accounting for leases, along with its experts' opinions that Winthrop did not have any objective expectation that the equipment would have any meaningful value at the end of the initial term and that the equipment, in fact, had no materially significant residual value at the end of the initial terms.

While we recognize this as evidence of the hardware's residual life, we disagree with Prospect's contention that the evidence is dispositive or that it necessarily creates a factual dispute for the jury to decide. See Hochstadter Dicker & Campo, supra, at 544 (explaining that although tax and accounting standards for determining residual life are "intended to distinguish between a true lease and a secured transaction, they are not necessarily controlling in the UCC context") (citing

-11-

State ex rel. Celebrezze v. Tele-Comms., Inc., 601 N.E.2d 234, 245 (1990) (explaining that exercising an option to renew for nominal consideration would allow the equipment to be utilized to the extent of its useful life, which "may have no resemblance to the term of depreciation for taxation purposes") (decision vacated Oct. 2, 1991). Moreover, as Prospect's expert explained, much of the hardware had a useful life that exceeded the initial term: "[Y]ou have a four-year lease and most of the assets within the lease have a normal useful life of five years. So at the end of four years, there's still one year left of – to be depreciated." Five of the seven schedules had four-year initial terms, and thus, even according to Prospect's evidence, the hardware's useful life was longer than the initial terms of those schedules. Prospect has not asserted a separate argument for the two schedules with five-year initial terms, schedules B01 or B02.

The parties' negotiations and the resultant lease agreement and schedules indicate true leases and Winthrop's reversionary interests. ECHN asked during negotiations to add a clause to purchase the equipment for $1 at the end of the lease. Winthrop refused and referred ECHN to another bank. ECHN understood that it paid lower monthly rent because it would not own the equipment upon termination. Consistent with this view, the lease agreement required Prospect to continue paying rent at the initial rate upon renewal and to return the equipment upon termination. Prospect thus could choose to continue to lease the equipment or to terminate the relevant schedule and return the equipment to Winthrop, at which point Winthrop would resell it.

Prospect's evidence that its payments during the initial terms met or slightly exceeded the cost of the equipment, with respect to most schedules, does not necessarily indicate that the transactions created security interests. The U.C.C. teaches that "[a] transaction in the form of a lease does not create a security interest merely because the present value of the consideration the lessee is obligated to pay the lessor . . . is substantially equal to or is greater than the fair market value of the

-12-

goods at the time the lease is entered into." Minn. Stat. § 336.1-203(c)(1). Moreover, in a finance lease, even if the lessee pays the equipment's purchase price in rent by the end of the initial term, the lessee has not necessarily paid for the cost of financing. See In re Edison Bros. Stores, Inc., 207 B.R. 801, 814 (Bankr. D. Del. 1997) ("[I]f the alleged lessee is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased goods *plus an interest charge* over the term of the alleged lease agreement, a sale is likely to have been intended since what the lessor will receive is more than a payment for the use of the leased goods and loss of their value; the lessor will receive a consideration that would amount to a return on its investment." (emphasis added)). We find compelling Winthrop's argument that the schedules' implied interest rates for the initial terms would be well below those for a secured loan and, with respect to one schedule, negative.[6] These economic realities do not indicate a sale.

We are mindful that Winthrop and ECHN intended each schedule to be a finance lease, which the U.C.C. specifically authorizes and which "shares many characteristics with a secured transaction and has generally rendered obsolete any methodology formerly used by courts based upon identifying attributes of ownership." In re Ecco Drilling Co., 390 B.R. 221, 225 (Bankr. E.D. Tex. 2008). "The Article 2A provisions governing a finance lease prescribe a set of circumstances

---

[6]We have focused on the initial terms in the economic realities analysis because Prospect could have terminated its obligations upon their completion. Prospect has not identified on appeal when it became the owner of the equipment, instead arguing that the district court should consider each initial and renewal term for each schedule. We decline to mandate Prospect's unwieldy proposition here, where the lessee could have terminated the schedules annually following the expiration of their initial terms and where the lessee has not identified the term in which each schedule became a security interest. See In re Pillowtex, Inc., 349 F.3d at 716 (party seeking recharacterization bears the burden of proof to establish that the lease is a security interest).

and rules that justify placing the lessor in [a] limited role, while still granting the lessor the benefits of ownership." Hochstadter Dicker & Campo, supra, at 525; see id. at 526–28 (listing typical finance lease provisions that courts previously considered "incidents of ownership"). Accordingly, finance leases are statutorily authorized to have "hell or highwater" and non-cancellation clauses, for example. See Minn. Stat. § 336.2A-407. With the unique nature of a finance lease, it is unsurprising that the agreement here had a "hell or highwater" clause that made rental payments mandatory or that disallowed Prospect from terminating any schedule during its initial term.[7]

This area of law, particularly with respect to transactions involving hardware, software licenses, and services, is unsettled and developing. ECHN entered into the agreement and schedules with Winthrop when it was advantageous for ECHN to rent and not own the equipment. Prospect realized that—unless it terminated the ironclad agreement—it was under a continuing obligation to pay Winthrop the amounts due under each schedule. Prospect thus tried to use legal recharacterization offensively to escape the obligations to which ECHN had agreed. Although the U.C.C. demands recharacterization under its bright-line test or when so compelled by the facts of the case, it does not demand so here, where the parties negotiated a lease agreement and related schedules that skirt the line of creating security interests without crossing it. We conclude that the district court correctly granted summary judgment in Winthrop's favor.

---

[7]Prospect relies on In re Xchange Tech. Grp., LLC, 2014 WL 7451973, at *4 (Bankr. D. Del. Dec. 30, 2014), which applied an earlier version of the U.C.C. that focused on the parties' intent. The bankruptcy court there determined that the lease was a security interest based, in part, on an option to purchase for nominal consideration. The lease there would have met the U.C.C.'s bright-line test. See Minn. Stat. § 336.1-203(b)(4). The remaining indicia of ownership in that case are commonly seen in finance leases. See, e.g., Minn. Stat. § 336.1-203(c) (A transaction in the form of a lease does not create a security interest merely because the lessee assumes the risk of loss or agrees to pay taxes and fees.).

### C. Damages & Attorneys' Fees

We find no error in the award of damages in the amount of the unpaid lease charges and other amounts due, as well as in the amount of the accelerated lease charges. See Winthrop Res. Corp., 361 F.3d at 472 ("The rule is well settled that a contract provision for liquidated damages can be enforced without proving actual damages as long as the amount stated is reasonable." (alteration omitted) (quoting Willgohs v. Buerman, 115 N.W.2d 59, 62 (Minn. 1962)). We disregard as moot Prospect's conditional argument regarding the order entitling Winthrop to prevailing-party attorneys' fees. We reject as premature Prospect's argument that it is entitled to have a jury determine attorneys' fees.

### III. Conclusion

The judgment is affirmed.

_____